TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos, la parte peticionaria, Autoridad de Carreteras y nos solicita la revisión de una Resolución emitida por el Tribunal de Primera Instancia, Sala Superior de Ponce (Hon. Ramón E. Meléndez Castro), el 18 de marzo de 2005, y notificada y archivada copia en autos el 6 de mayo de 2005. Mediante la referida Resolución, el foro de instancia resolvió que el diseño que cumple con la sentencia dictada por el Tribunal de Primera Instancia el 24 de junio de 1996, y posteriormente confirmada por el Tribunal Supremo el *566 29 de diciembre de 2000, es el diseño original preparado por el Ing. Carlos R. Daniels. Además, se le ordena a la Autoridad de Carreteras y Transportación que construya dicho proyecto según originalmente diseñado y se le concedió un término de treinta (30) días para sacarlo a subasta.
Luego de estudiado los hechos y el derecho aplicable, expedimos el auto de certiorari, modificamos la Resolución recurrida y así modificada se confirma.
I
El Municipio de Ponce, en lo sucesivo Municipio, creó durante el año 1990 una oficina con el propósito de preparar un Plan Maestro para guiar el desarrollo ordenado de su territorio. El Municipio contrató al Arquitecto Sr. Javier Bonnin como director de esa oficina con dicha encomienda. El 30 de agosto de 1991 se aprobó la Ley Núm. 81, Ley de Municipios Autónomos, 21 L.P.R.A. Sees. 4001 et seq., otorgándole la facultad a los municipios de adoptar planes de ordenación territorial de acuerdo a lo dispuesto en dicha Ley. Véase, 21 L.P.R. A. See. 4602.
El Municipio se acogió a las disposiciones de esa Ley y creó la Oficina de Ordenación Territorial con el propósito de elaborar un Plan de Ordenación Territorial. Entonces, el Municipio procedió a celebrar varias vistas públicas en las cuales participó la ciudadanía. Además, éste se mantuvo en estrecha coordinación con los funcionarios públicos de las agencias pertinentes [la Autoridad de Acueductos y Alcantarillados (A.A.A.), la Autoridad de Carreteras y Transportación (A.C.T.), la Autoridad de Edificios Públicos (A.E.P.), la Autoridad de Energía Eléctrica (A.E.E.), la Autoridad de los Puertos (el Municipio desistió de su reclamación contra ésta), el Departamento de la Vivienda (Vivienda), el Departamento de Recursos Naturales y Ambientales (Recursos Naturales), la Junta de Planificación (Junta) y la Puerto Rico Telephone Company (P.R.T.C.)].
A partir de abril de 1992, se intensificaron las reuniones, cartas y consultas en las cuales participaron "funcionarios de la Oficina de Ordenación Territorial, el Alcalde de Ponce, personal técnico de las agencias concernidas, así como sus Secretarios y Directores, el Secretario de Estado, ayudantes del gobernador, miembros de la Junta de Planificación e inclusive el propio Gobernador". [Apéndice, Sentencia del 24 de junio de 1996, pág. 9].
Mediante dichas comunicaciones se determinó cuáles proyectos iban a ser ejecutados por las diferentes instrumentalidades públicas para el Programa de Ordenación Territorial. Dichos proyectos, en su mayoría, se encontraban en los programas de obras permanentes de las agencias demandadas. De igual manera, los proyectos de las corporaciones públicas formaban parte de sus programas de obras permanentes, lo que indicaba que habían sido aprobados por sus Juntas de Gobierno. Éstas, además, determinaron que tenían capacidad financiera para cumplir con los proyectos dentro del plazo en que fueron programados. En cuanto a los departamentos posteriormente demandados (incluyendo al aquí peticionario, A.C.T.], éstos incluyeron los fondos para el financiamiento de los proyectos en el Programa de Inversiones de Cuatro Años (P.I.C.A.), el cual fue sometido por la Junta a la Asamblea Legislativa. Los proyectos acordados por las diferentes instrumentalidades públicas fueron incluidos en una tabla, la cual fue titulada como "los programas de proyectos de inversión certificados por las agencias públicas".
El 22 de octubre de 1992, el Plan de Ordenación Territorial para el Municipio fue aprobado por su Asamblea Municipal mediante la Ordenanza Núm. 601, Serie 1992-93. Dicho Plan fue elevado a la Junta para su consideración.
El 28 de octubre de 1992, la Junta adoptó el Plan de Ordenación Territorial del Municipio mediante la Resolución Núm. JP-TP-63-1, junto con las certificaciones emitidas por las instrumentalidades públicas y las variaciones hechas por la A.C.T., Recursos Naturales y la A.A.A., las cuales incluyó en su expediente.
*567 El 6 de noviembre de 1992, el Gobernador del Estado Libre Asociado de Puerto Rico emitió la Orden Ejecutiva Núm. OE-1992-66, mediante la cual aprobó el Plan de Ordenación Territorial de Ponce, según fue adoptado por la Junta. Luego, entre el 28 de octubre y el 15 de diciembre de 1992, el Gobernador, junto con las agencias públicas demandadas y el Municipio, suscribieron un Convenio, el cual fue presentado al Registro de Contratos del Municipio el 15 de septiembre de 1993 y a la Oficina de la Contralor el día siguiente. Dicho Convenio, en lo pertinente, lee así:

“I. COMPARECENCIA

Por la primera parte, El Gobierno Central DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO, en adelante denominado "El Gobierno Central", representado por el Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Rafael Hernández Colón, la Autoridad de Carreteras representada por su Director, el Ing. Jorge L. Bigas Mulero, Autoridad de Acueductos y Alcantarillados representada por su Directora, Ing. María Margarita Irizarry, Autoridad de Edificios Públicos representada por su Director, Arq. Luis Rafael Arias Albizu, Autoridad de los Puertos, representada por su Director, Gen. José Buitrago, Autoridad de Energía Eléctrica representada por su Director, Sr. José A. del Valle, Departamento de la Vivienda representada por su Administrador, Sr. Rigoberto Figueroa, Departamento de Recursos Naturales representada por su secretario, Sr. Santos Rohena Betancourt, y Puerto Rico Telephone Company representada por su Director, el Ing. Ramón Arce, en adelante denominadas "LAS AGENCIAS".

Por la segunda parte, EL MUNICIPIO DE PONCE, en adelante denominado "EL MUNICIPIO", representado por su Alcalde, Hon. Rafael Cordero Santiago.

Las partes aseguran tener la capacidad y autoridad en Ley para otorgar este convenio, la cual surge de la Ley núm. 81 de 30 de agosto de 1991, según enmendada, conocida como Ley de Municipios Autónomos.

II. PREAMBULO

En este convenio se pone en vigor la política pública del Estado Libre Asociado de Puerto Rico establecida en la Ley de Municipios Autónomos consistente en otorgarle a los municipios el máximo posible de autonomía además de proveerles a estos (sic) los poderes y facultades que sean necesarios para asumir un rol central y fundamental en su desarrollo urbano, social y económico.

El Municipio de Ponce en cumplimiento de lo dispuesto en la Ley de Municipios Autónomos ha invertido considerables recursos económicos y humanos y tiempo en elaborar un Plan de Ordenamiento Territorial para disponer para el mejor uso del suelo dentro de sus límites territoriales y desarrollar proyectos de infraestructura para la promoción mediante la adopción de un Plan de Ordenamiento Territorial.

El Plan de Ordenamiento contiene el Programa de Proyectos de Inversión en el Municipio de Ponce, debidamente certificados por las agencias públicas pertinentes y por el Municipio, según corresponde, como exige la referida Ley Núm. 81, según enmendada.

El análisis regional permite conocer las características sociales y económicas de la población, así como conocer las ventajas, oportunidades y limitaciones que presenta cada región. A su vez permite el tener un diagnóstico de los componentes de infraestructura básica y las necesidades de construcción y rehabilitación de los sistemas. De esta forma se provee el análisis necesario que permita la identificación de oportunidades y condiciones para estimidar un desarrollo balanceado a nivel regional y se optimice la competitividad interregional.

Entre los proyectos de inversión certificados se encuentran varios a ser desarrollados por las AGENCIAS 
*568
aquí comparecientes. Los referidos proyectos deben ser desarrollados en su totalidad para poder dar efecto al Plan de Ordenación y efectuar el desarrollo del Municipio conforme a la política pública expuesta en la citada Ley de Municipios Autónomos. [Énfasis nuestro]

En consideración a las contraprestaciones antes mencionadas, las partes contraen las siguientes OBLIGACIONES:

1. Las AGENCIAS completarán el desarrollo de los siguientes proyectos en el Municipio de Ponce,

a. Autoridad de Carreteras - [Apéndice, Sentencia del 24 de junio de 1996, pág. 72] (...)

2. El Municipio de Ponce por su parte ofrecerá el apoyo económico que esté dentro de su presupuesto para la consecución de los referidos proyectos.

B. ENMIENDAS

Las partes cumplirán estrictamente con los términos y condiciones indicados en este convenio y no se reconocerá ninguna enmienda a los mismos excepto por acuerdo escrito entre las partes.

D. TERMINO

Este convenio entrará en vigor inmediatamente que sea firmado por las partes comparecientes. Los proyectos aquí descritos, se llevarán a cabo según programados entre el 1 de enero de 1993 y el 31 de diciembre de 1996.

En abril de 1993, se celebró una reunión en la Fortaleza en la cual participaron los recién nombrados jefes de los diferentes departamentos del Gobierno Central, directores y secretarios de las instrumentalidades públicas aquí demandadas, el Ledo. Alvaro Cifuentes -Secretario de la Gobernación- y el Alcalde del Municipio, en lo sucesivo Alcalde. En dicha reunión, el Alcalde solicitó que las diferentes instrumentalidades cumplieran con los compromisos que habían contraído mediante el Plan de Ordenación y el antes citado Convenio y los representantes de las distintas instrumentalidades públicas indicaron cuáles de los proyectos iban a llevar a cabo y cuáles no. Las instrumentalidades que unilateralmente dejaron de cumplir con algunos de los compromisos de inversión establecidos en el Plan de Ordenación Territorial y en el Convenio fueron demandadas, siendo una de ellas, la A.C.T. Dichas entidades gubernamentales no hicieron uso de los mecanismos dispuestos en la Ley de Municipios Autónomos, supra, para solicitar la revisión parcial del Plan. LaA.C.T. incumplió específicamente con:

PR-2

Extensión Ronda de Circunvalación Sur, conector a Expreso (Fase I) y Construcción de las Calles Marginales Norte a Sur, Intersección El Tuque (Fase II-A). Dicho proyecto debió haber comenzado en el año fiscal 1992-93.

PR-9

Desde la Ave. Tito Castro (PR-14) hasta las cercanías de la PR 503 (Fase II-A). Este proyecto debió haber dado comienzo en el año fiscal 1993-94.

Cerca de PR 503 hasta PR-10 existente fase II-B PR-132 y en sección 20.60m desde PR-132 hasta PR-2. El 
*569
proyecto debió haber dado comienzo en el año fiscal 1992-93.

Mejoras geométricas a la PR-503 desde la salida de la PR-9 hasta Mayor Cantera.

PR-10

Ave. Hostos (PR-10) mejoras habilitar a cuatro carriles y soterrado desde La Abolición hasta la Ave. Las Américas. Este proyecto debió haber comenzado en el año fiscal 1992-93.

PR-14

Construcción Intersección a desnivel entre (PR-14) y (PR-133). Este proyecto debió haber comenzado en el año fiscal 1992-93. Sin embargo, no se comenzó hasta el año fiscal 1994-95.

PR-139

Desde PR-14 hasta PR-139 (cerca de donde se construye la represa Cerrillos). Este proyecto debió haber comenzado en el año fiscal 1992-93. Apéndice, Sentencia de 24 de junio de 1996, págs. 16-17]. ”

La A.C.T. indicó que su incumplimiento se debió a que no consideraba que los mismos fueran prioritarios. En cuanto a estos proyectos, el Tribunal de Primera Instancia determinó que su no realización representaba una merma de $70,179,999 en la inversión de la A.C.T. en el Municipio.
El 28 de octubre de 1993, el Municipio demandó a las instrumentalidades públicas que incumplieron, solicitando el cumplimiento específico del Convenio. Las partes estipularon los siguientes hechos ante el Tribunal de Primera Instancia:

“A mediados del año 1990, el Municipio de Ponce comenzó a recopilar datos cartográficos y socio-económicos y a elaborar las líneas generales de un Plan Maestro.

El 12 de diciembre de 1990, el Alcalde de Ponce, Hon. Rafael Cordero Santiago, presentó la idea del Plan Maestro a una concurrencia que se dio cita en el Teatro La Perla de Ponce.

En enero de 1991, el Municipio creó la Oficina del Plan Maestro y en los meses siguientes contrató personal técnico especializado para la elaboración del Plan Maestro.

El 30 de agosto de 1991 entró en vigor la Ley Núm. 81, conocida como Ley de Municipios Autónomos, la cual ha sido objeto de distintas enmiendas desde su aprobación.

El Municipio de Ponce se acogió a las disposiciones de la Ley de Municipios Autónomos para elaborar en lugar del Plan Maestro, el Plan de Ordenación Territorial contemplado por dicha ley.

El Plan de Ordenación Territorial elaborado por el Municipio tiene vigencia de ocho (8) años y está compuesto del Memorial, el Programa y la Reglamentación.

El Programa del Plan Territorial del Municipio de Ponce tiene un plazo de (4) años.

Con participación ciudadana, el Municipio celebró todas las vistas públicas requeridas por la Ley y notificó de dicha celebración a la Junta de Planificación.

*570
Para fines de la elaboración del Plan, el Municipio creó las Juntas de Comunidad requeridas por la Ley.

Con fecha de 22 de octubre de 1992, la Asamblea Municipal aprobó el Plan de Ordenación para el Municipio de Ponce.

Con fecha del 28 de octubre de 1992, la Junta de Planificación adoptó el Plan de Ordenación. ”

El Estado Libre Asociado y todas las agencias públicas aquí demandadas exceptuando la Junta de Planificación, suscribieron un convenio con el Municipio de Ponce que titularon "Convenio para el Desarrollo de Proyectos Programados entre el Gobierno Central y el Municipio de Ponce". Este convenio está fechado el 28 de octubre de 1992, pero algunos de los que lo suscribieron en fechas posteriores al 28 de octubre, recayendo dichas fechas que no pueden identificar con precisión, entre los meses de noviembre a diciembre de 1992.
En el juicio en su fondo, el Tribunal de Primera Instancia, Sala Superior de Ponce, recibió prueba en cuanto a los daños y peijuicios que le fueran ocasionados al Municipio por la no construcción de los proyectos incluidos en el Plan de Ordenación Territorial y en el Convenio entre las partes. Mediante la Sentencia de 24 de junio de 1996, el Foro de instancia declaró Con Lugar la demanda, ordenando la construcción de los proyectos que solicitó el Municipio. Además, determinó que el Municipio debe ser compensado por la suma de $16,418,845.
Los demandados apelaron ante nos mediante las apelaciones número KLAN-96-00974, KLAN-96-01027, KLAN-96-01057, KLAN-96-01058, KLAN-96-01063 y KLAN-96-01065. Este foro, el 26 de noviembre de 1997 resolvió modificar la sentencia de instancia a los efectos de disponer cómo algunos de los demandados debían cumplir con la terminación de determinados proyectos y dejar sin efecto la fijación de daños y perjuicios para que se haga cuando el Comisionado informe al Tribunal de Primera Instancia,"qué determinado demandado ha cumplido con sus obligaciones o que pudiera precisar la fecha de cumplimiento de todos los proyectos de cada demandado, en forma individual.
De dicha sentencia acudió en revisión mediante escrito de Certiorari el Municipio Autónomo de Ponce y nuestro Más Alto Foro lo acogió y resolvió el 29 de diciembre de 2000. El Tribunal Supremo allí resolvió reinstaurar la sentencia del foro de instancia eliminando así las modificaciones hechas por este Tribunal en aquella sentencia.
Nuevamente, el caso está ante nuestra consideración. Esta vez acude la Autoridad de Carretera y Transportación y nos solicita la revisión de una Resolución del Tribunal de Primera Instancia señalando la comisión de los siguientes errores:

“Erró el Tribunal de Instancia al determinar que la A.C.T. no ha sido diligente en la ejecución de la Sentencia dictada en el presente caso en cuanto al proyecto AC200220.

Erró al determinar que la A. C. T. tenía un compromiso con la comunidad Punto Oro y el Municipio de Ponce desde septiembre de 2002 el cual surgía de una carta del 31 de octubre de 2002 firmada por el entonces Director Ejecutivo el Dr. Fernando Fagundo y por ello tenía que construir el diseño original.

Erró sustituir el criterio del organismo administrativo ACT en materia especializada por el criterio del T.P. I.

Erró al ordenar la celebración de la subastas del proyecto AC200220 en un término de 30 días a partir del dictamen de la sentencia. ”

*571 Con el beneficio de la comparecencia de todas las partes, nos encontramos en posición de resolver el presente recurso.
II
A. Aspectos Generales de los Contratos
Los contratos existen desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio. Art. 1206 del Código Civil, 31 L.P.R.A. see. 3371; Amador v. Cone. Igl. Univ. de Jesucristo, 150 D.P.R. 571, 581-582 (2000). Existe un contrato cuando concurren los siguientes requisitos: (a) consentimiento de los contratantes; (b) objeto cierto que sea materia del contrato, y (c) causa de la obligación que se establezca. Art. 1213 del Código Civil, 31 L.P.R.A. see. 3391; Díaz Ayala v. E.L.A., Opinión de 30 de marzo de 2001, 2001 J.T.S. 49, a la pág. 1066. Una vez concurren las condiciones esenciales para su validez, los contratos son obligatorios. Art. 1230 del Código Civil, 31 L.P.R.A. see. 3451. El consentimiento se manifiesta por el concurso de la oferta y la aceptación sobre la cosa y la causa que ha de constituir el contrato. Art. 1214 del Código Civil, 31 L.P.R.A. see. 3401; Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517, 521 (1982).
Los contratos son fuente de obligación que se perfeccionan desde que las partes contratantes consienten voluntariamente, a cumplir con los términos de los mismos. Las partes contratantes no solamente se obligan a lo pactado, sino también a toda consecuencia que sea conforme a la buena fe, al uso y a la ley. Art. 1210, Código Civil, 31 L.P.R.A. see. 3375. Véase además: Irizarry López v. García Cámara, Opinión de 27 de noviembre de 2001, 2001 J.T.S. 164, a la pág. 456.
Los contratos son negocios jurídicos bilaterales que constituyen una de las fuentes de las obligaciones. Amador v. Conc. Igl. Univ. de Jesucristo, supra. Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarias a las leyes, a la moral, ni al orden público. Art. 1207 Código Civil, 31 L.P.R.A. see. 3372. Véase además: Irizarry López v. García Cámara, supra; Trinidad García v. Chade, Opinión de 18 de enero de 2001, 2001 J.T.S. 10; Luán Investment Corp. v. Rexach Construction Co. Inc, Opinión de 8 de diciembre de 2000, 2000 J.T.S. 196. Amador Parrilla v. Concilio Iglesia Universal de Jesucristo, supra. Las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de los mismos. Art. 1044 del Código Civil, 31 L.P. R.A. see. 2994. De conformidad con el principio rector de pacta sunt servanda, las partes contratantes se obligan a todos los extremos de lo pactado que sean conformes a la ley, a la moral y al orden público.
B. Incumplimiento Contrato
En cuanto al cumplimiento de los contratos, cuando en un contrato bilateral uno de los contratantes no cumple con lo que se obligó, el otro contratante tiene el derecho de exigir entre el cumplimiento o la resolución de las obligaciones con el resarcimiento de daños y abono de intereses en ambos casos. A tales efectos, el Artículo 1077 del Código Civil, supra, sec. 3052, dispone lo siguiente:

“La facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso de que uno de los obligados no cumpliere con lo que le incumbe.

El perjudicado podrá exigir entre el cumplimiento o la resolución de la obligación, con el resarcimiento de daños y abono de intereses en ambos casos. También podrá pedir la resolución, aún después de haber optado por el cumplimiento, cuando éste resultare imposible.

[...]”. [Énfasis nuestro].
*572 Ninguna parte puede exigir el cumplimiento de una obligación contraria sin antes cumplir o intentar cumplir su propia obligación. Martínez v. Colón Franco, Concepción, 125 D.P.R. 15, 33 (1989). Para que se aplique el antes mencionado artículo, es menester que la obligación incumplida sea esencial o que su cumplimiento constituya el motivo del contrato para la otra parte. Estas normas generales sobre la interpretación y el cumplimiento específico de los contratos son aplicables a las cláusulas del contrato objeto de este litigio.
C. Los Contratos y el Estado
Como norma general, para los efectos de la aplicación de las disposiciones y doctrinas referentes a los contratos, el Estado Libre Asociado de Puerto Rico se considera como un contratante privado. Cuando el Estado contrata, la interpretación del contrato debe hacerse como si se tratara de una contratación entre dos personas particulares. Zequeira v. C.R.U.V, 83 D.P.R. 878, 880-881 (1967); Rodríguez v. Municipio, 75 D.P.R. 479, 494 (1953). Ello significa que una vez el Estado suscribe un contrato con una persona privada, ambos están obligados por las normas generales relativas a los contratos, y sus correspondientes interpretaciones a la luz de nuestros pronunciamientos aplicables.
Por otro lado, cuando la contratación involucra el uso de bienes o fondos públicos, hemos insistido, además, en la aplicación rigurosa de todas las normas pertinentes a la contratación y desembolso de esos fondos, a los fines de proteger los intereses y dineros del pueblo. Hemos enfatizado que el manejo prudente de fondos públicos está saturado de intereses de orden público. Hemos resaltado normativamente la imperiosa necesidad de evitar el dispendio, la extravagancia, el favoritismo y la prevaricación en los contratos gubernamentales. Véase, Fernández & Gutiérrez v. Municipio de San Juan, 147 D.P.R. 824 (1999); Hatton v. Mun. de Ponce, 134 D.P.R. 1001 (1994); Mar-Mol Co., Inc. v. Adm. Servicios Gens., 126 D.P.R. 864 (1990); Ocasio v. Alcalde de Maunabo, 121 D.P.R. 37, 54 (1988); Morales v. Municipio de Toa Baja, 119 D.P.R. 682, 693 (1987); Cancel v. Municipio de San Juan, 101 D.P.R. 296, 300 (1973); Justiniano v. E.L.A., 100 D.P.R. 334, 338 (1971).
Ciertamente, al interpretar el sentido contemporáneo de la disposición del Código Civil que requiere que los contratos no sean contrarios al orden público, no podemos ignorar que en la contratación por el Estado, la sana y recta administración de los fondos del pueblo está revestida del más alto interés público, y que todo organismo gubernamental está obligado a observar cabalmente la esencia del principio consagrado en la sección 9 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico de que los fondos públicos sólo pueden gastarse para fines públicos legítimos. Como hemos señalado antes, todas las actuaciones del gobierno están siempre circunscritas por la Constitución. El gobierno, como contratante, sigue siendo el gobierno, y no puede actuar de un modo que esté reñido con los principios que encama el orden constitucional. C.R.U.V. v. Peña Ubiles, 95 D.P.R. 311, a las págs. 315-317 (1967). El concepto de “orden público” del Artículo 1207 del Código Civil, pues, incluye en su contenido no sólo la prohibición de cláusulas contractuales abusivas o leoninas discutidas antes, sino también la política pública de origen constitucional que preconiza el uso escmpuloso de los fondos públicos.
D. Revisión Administrativa
La Sección 4.1 de la Ley de Procedimiento Administrativo Uniforme (L.P.A.U.), 3 L.P.R.A. see. 2171, permite que se solicite al Tribunal de Apelaciones la revisión de decisiones administrativas. Al respecto, es norma de derecho claramente establecida que los tribunales apelativos han de conceder gran consideración y deferencia a las decisiones administrativas en vista de la vasta experiencia y conocimiento especializado de la agencia. Socorro Rebollo v. Yiyi Motors, Opinión de 13 de enero de 2004, 2004 J.T.S. 4, a la pág. 501; Pacheco Torres v. Estancias de Yauco, S.E., Opinión de 30 de septiembre de 2003, 2003 J.T.S. 150, a la pág. 210; T. Jac, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70 (1999); Agosto v. Fondo del Seguro del Estado, 132 D.P.R. 866, 879 (1993). Por lo tanto, la persona que alegue lo contrallo tendrá que presentar evidencia suficiente para *573 derrotar tal presunción, no pudiendo descansar únicamente en meras alegaciones. Pacheco Torres v. Estancias de Yauco, S.E., supra, a las págs. 210-211.
La revisión judicial es limitada. Sólo determina si la actuación administrativa fue una razonable y cónsona con el propósito legislativo o si por el contrario fue irrazonable, ilegal o medió abuso de discreción. Mun. de San Juan v. J.C.A, 149 D.P.R. 263 (1999); T-JAC, Inc. v. Caguas Centrum Limited Partnerhip, S.E., supra, a la pág. 884; Com. Vec. Pro-Mej., Inc. v. J. P., 147 D.P.R. 750 (1999); Fuertes y otros v. A.R.P.E., 134 D.P.R. 947, 953 (1993).
Es norma reiterada que los procedimientos y decisiones administrativas tienen una presunción de regularidad y corrección que debe refutar quien las impugna, sin descansar en meras alegaciones. Socorro Rebollo v. Yiyi Motors, supra; Pacheco Torres v. Estancias de Yauco, S.E., supra, a las págs. 210-211; Com. Vec. Pro-Mej. Inc. v. J.P., supra. Sin embargo, las cuestiones de derecho, contrario a las de hechos, que no involucren interpretaciones efectuadas dentro del ámbito de especialización de la agencia, son revisables en toda su extensión. Véanse: Pacheco Torres v. Estancias de Yauco, S.E., supra, a la pág. 211; San Antonio Maritime v. Puerto Rican Cement, Opinión de 19 de febrero de 2001, 2001 J.T.S. 20, pág. 860; T. Jac, Inc. v. Caguas Centrum Limited, supra. Si las conclusiones de derecho de un foro administrativo están sujetas al mandato de la ley, los tribunales debemos sostenerlas. Misión Ind P.R. v. J.P., supra, a la pág. 133. Es por esta razón que los tribunales debemos ser cautelosos al intervenir con dichas determinaciones. Viajes Gallardo v. Homero Clavell, 131 D.P.R. 275, 290 (1992). Aun en los casos dudosos, cuando la interpretación de la agencia no sea la única razonable, la actuación del organismo administrativo merece deferencia sustancial. Véase: De Jesús v. Departamento de Servicios Sociales, 123 D.P.R. 407, 418 (1989); Asociación Médica de Puerto Rico v. Cruz Azul, 118 D.P.R. 669, 678 (1987).
Con respecto a este particular, el Tribunal Supremo ha expresado que "[n]o empece esta deferencia, la interpretación de la agencia no merece deferencia si la misma afecta derechos fundamentales, resultare irrazonable, o conduce a la comisión de una injusticia". Costa, Piovanetti v. Caguas Expressway, 149 D.P.R. 881 (1999). Por otro lado, la interpretación de una agencia administrativa tampoco podrá prevalecer y sostenerse cuando la misma produce resultados inconsistentes con o contrarios al propósito del estatuto interpretado. Id; Calderón v. Adm. Sistemas de Retiro, 129 D.P.R. 1020, 1042 (1992).
Además, se ha sostenido que los tribunales revisores podrán intervenir con una determinación administrativa, si la misma fue "irrazonable, ilegal o si medió abuso de discreción". T. Jac, Inc. v. Caguas Centrum Limited, supra. Véase, además: Agosto v. Fondo del Seguro del Estado, supra.
El criterio rector para los tribunales será la razonabilidad en la actuación de la agencia recurrida. Así pues, al realizar su función revisora, el tribunal está compelido a considerar la especialización y experiencia de la agencia sobre las cuestiones que tuviera ante sí. Por tanto, en el descargo de su función deberá caracterizar entre asuntos de discernimiento estatuario o cuestiones de especialización administrativa. La deferencia reconocida no equivale a una renuncia de la función revisora del Tribunal en instancias apropiadas y meritorias, como resulta ser cuando el organismo administrativo ha errado en la aplicación de la ley. Socorro Rebollo v. Yiyi Motors, supra, a las págs. 501-502; Reyes Salcedo v. Policía de P.R., 143 D.P.R. 85 (1987).
La Sección 4.5 de la Ley de Procedimiento Administrativo Uniforme (L.P.A.U.), 3 L.P.R.A. 2175, establece que "[l]as determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo". Véase: Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 131 (1998); Metropolitana S.E. v. A.R.P.E., 138 D.P.R. 200, 213 (1995). Esta disposición recoge estatutariamente la norma jurisprudencial que establece que, de ordinario, los tribunales no deben intervenir con las determinaciones de hechos de un organismo administrativo si éstas se apoyan en prueba suficiente que suija del expediente considerado en su totalidad. Misión Ind. P.R. v. J.P., supra; *574 Metropolitana S.E. v. A.R.P.E., supra; Fac. C. Soc. Aplicadas Inc. v. C.E.S., 133 D.P.R. 521, 532-533 (1993).
La evidencia sustancial según ha sido definida "es aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión". Misión Ind. P.R. v. J.P., supra; Hilton Hotels v. Junta de Salario Mínimo, 74 D.P.R. 670, 687 (1953). Por ello, la parte afectada por una determinación de hecho de una agencia debe, en primer lugar, "demostrar que existe otra prueba en el récord que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración." Ramírez v. Depto. de Salud, 147 D.P.R. 901, 905 (1999); Misión Ind. P.R. v. J.P., supra. “Si la parte afectada no demuestra la existencia de otra prueba, las determinaciones de hechos de una agencia deben ser sostenidas por el tribunal revisor." Ramírez Rivera v. Depto. de Salud, supra. Esto persigue evitar que los tribunales sustituyan el criterio de la agencia por el suyo propio.
Se debe mantener presente que las determinaciones de hechos de los organismos y agencias públicas tienen a su favor una presunción de regularidad y corrección que debe ser respetada mientras la parte que las impugne no produzca suficiente evidencia para derrotarlas. Rivera Concepción v. A.R.P.E., Opinión de 29 de septiembre de 2000, 2000 J.T.S. 155, a la pág. 160; Henríquez v. Consejo Educación Superior, 120 D.P.R. 194, 210 (1987).
III
Entre el 28 de octubre y el 15 de diciembre de 1992, el Gobernador, junto con las agencias públicas concernidas (entre las cuales estaba A.C.T.) y el Municipio Autónomo de Ponce, suscribieron un Convenio, el cual fue presentado al Registro de Contratos del Municipio el 15 de septiembre de 1993 y a la Oficina de la Contralor el día siguiente. Dicho Convenio lee como sigue en la sección pertinente:

“Término

Este convenio entrará en vigor inmediatamente que sea firmado por las partes comparecientes. Los proyectos aquí descritos, se llevarán a cabo según programados entre el 1 de enero de 1993 y el 31 de diciembre de 1996.” [Énfasis nuestro]
Nos parece incorrecto de parte de la Autoridad de Carreteras y Transportación alegar que erró el Tribunal de Primera Instancia al determinar que dicha agencia no ha sido diligente en la ejecución de la Sentencia dictada en cuanto al proyecto AC200220. El incumplimiento de A.C.T. es patente. Los términos del convenio eran claros y aún así dicha Agencia intentó invalidarlo en los tribunales, proceso que culminó con una sentencia del Tribunal Supremo validando las determinaciones del foro de instancia, el cual ordenó: “a las instrumentalidades públicas aquí demandadas a la construcción de los proyectos que solicita el Municipio de Ponce en forma compatible con las distintas providencias contenidas en esta sentencia” [Apéndice, Sentencia de 24 de junio de 1996, pág. 71]
Desde el 29 de diciembre de 2000, ya el Supremo había determinado que el convenio era válido y vinculante para las distintas agencias de gobierno demandadas, incluyendo al aquí peticionario A.C.T. A las alturas de septiembre de 2005, la agencia peticionaria aún no ha comenzado la construcción del proyecto y sobcita unos seis meses adicionales para completar el rediseño del proyecto.
Desde el 15 de noviembre de 2001, la A.C.T. ha presentado diversos calendarios para la ejecución del proyecto y no ha cumplido con ninguno. El 7 de octubre de 2004, se celebró una audiencia especial pare discutir el proyecto AC200220. Durante dicha vista, el subdirector ejecutivo del A.C.T., el big. Fernando Pont, indicó que la Autoridad no tenía el presupuesto disponible para que el proyecto saliera a subasta y que estaba buscando la manera de bajar el costo del mismo. En esta ocasión, el Ing. Carlos R. Daniels, diseñador del proyecto, le *575 manifestó al Tribunal que el diseño estaba en planos finales y que incluia un puente en Punto de Oro, las marginales de cuatro carriles y el drenaje para evitar las inundaciones.
El 29 de octubre de 2004, se celebró otra vista especial en la cual A.C.T. señaló que tenía que someter el diseño del proyecto a un “value engineering”, aclarando que ello no significa un rediseño.
El 17 de noviembre de 2004, la A.C.T. reiteró que el proceso de “value engineering” no se trataba de un rediseño y admitió que los fondos para el proyecto estarían disponibles en su totalidad mediante pareo de fondos federales, corroborando así una carta de la Oficina de presupuesto de la A.C.T. suscrita por el Sr. Norberto Mass el 4 de noviembre de 2004.
No es sino hasta el 9 de diciembre de 2004, contrario a todas las comunicaciones de la A.C.T. hasta el momento, que dicha Agencia determinó rediseñar el proyecto para eliminar el puente de Punto de Oro y cambiar el acceso de los residentes entre otras cosas, con el propósito de abaratar los costos del proyecto. El 13 de enero de 2005, se celebró una vista pública con la Comunidad de Punto Oro sobre el proyecto AC200220, y la comunidad se opuso al nuevo diseño.
En una vista de seguimiento celebrada el 26 de enero de 2005, se le informó al Tribunal que en la vista pública la comunidad expresó una fuerte oposición al cambio de diseño. El Tribunal en aquella ocasión señaló que el Ing. Jack Allison, Director Ejecutivo de la A.C.T., había expresado que en caso de oposición comunitaria se construiría el proyecto con su diseño original.
La A.C.T. alegó que el motivo para su incumplimiento fue causado por el alto costo de las expropiaciones de los terrenos a razón de la aprobación del nuevo Plan de Ordenamiento Territorial del Municipio Autónomo de Ponce. Sin embargo, lo cierto es que el Municipio no estaba impedido de aprobar un nuevo Plan de Ordenamiento Territorial. No se le puede exigir al Municipio que congele todos sus proyectos de ordenamiento territorial en espera del cumplimiento de la A.C.T., sobretodo cuando es la propia Autoridad que ha dilatado la construcción del proyecto. Además, no se presentó prueba que estableciera que el Municipio aprobó la nueva medida territorial malintencionadamente con el propósito de lucrarse indebidamente del proceso de expropiación.
La A.C.T. no puede dilatar ad infinitum la ejecución del proyecto convenido con el Municipio, sin tan siquiera justificar el retraso. La Agencia alega que el costo del diseño original significa un costo adicional de veintisiete millones de dólares ($27,000,000.00), mas sin embargo reconoce que el nuevo diseño no incluye una rampa de acceso la cual habría que necesariamente construir a una costo de aproximadamente diez millones de dólares ($10,000,000.00) sin incluir los gastos del rediseño y otros. Además, la A.C.T. tampoco toma en cuenta el costo que le representaría al Municipio dicho redisefio. También, hay que señalar que el Municipio se ha comprometido en negociar con los afectados para abaratar los costos de la expropiación requerida por la A. C.T.
No habiendo la A.C.T. demostrado convincentemente las ventajas del nuevo diseño vis a vis los gastos y el peijuicio acumulado causado al Municipio de Ponce por el retraso injustificado de la construcción, no podemos mostrarle deferencia a la determinaciones hechas al respecto por la Agencia.
En cuanto al segundo error señalado por la A.C.T., ciertamente, una simple carta del Director Ejecutivo de la A.C.T. no puede comprometer de forma vinculante a la Agencia a tomar cierta acción. Sin embargo, como hemos visto, el compromiso de la A.C.T. en la construcción del proyecto no surge de dicha carta exclusivamente, sino de un largo historial de promesas incumplidas que se remontan a principios de 2001.
El tercer Error señalado tampoco se cometió. No nos encontramos ante la situación de que los tribunales *576 hayan sustituido el criterio especializado de la agencia por su criterio particular. Estamos ante una situación de claro y patente incumplimiento contractual de la agencia de un convenio válido, suscrito por todas las partes y, por ende, vinculante. Así lo determinó el Tribunal Supremo el 29 de diciembre de 2000: “...las entidades públicas comparecientes se obligaron a desarrollar en el Municipio los proyectos incluidos en el Plan, según fueron certificados posteriormente”. [Subrayado en el original] [Apéndice, Sentencia de 29 de diciembre de 2000, pág. 84]
Lee la sentencia de instancia de 24 de junio de 1996, posteriormente confirmada por el Tribunal Supremo: “Con relación a la certificación formulada por la Autoridad de Carreteras y Transportación (...), resolvemos que definitivamente no fue la intención de la Autoridad de Carreteras y Transportación expresar una reserva de poderes de la agencia para reprogramar en el futuro los proyectos de inversión que estaba certificando... ”. [Apéndice, Sentencia de 24 de junio de 1996, págs. 58-59]
En cuanto al último error señalado, en vista de que el proceso de subasta tiene que llevarse acabo con el mayor cuidado y corrección posible siendo su propósito principal la protección de los fondos públicos, se le concede al peticionario un término de tres (3) meses para llevar acabo el mismo.
IV
Por los fundamentos anteriormente expuestos, expedimos el auto solicitado y se modifica la Resolución recurrida para concederle a A.C.T. un término de tees (3) meses para llevar acabo la subasta y respecto a los demás extremos, se confirma.
Lo acordó y ordena el Txibunal, y lo certifica la Secretaria del Tribunal de Apelaciones.
Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones