ROBERTO HATTON, HOSPITAL AND SURGICAL SYSTEMS, INC., demandantes y recurridos, *v.* MUNICIPIO DE PONCE, demandado y recurrente.

*Número:* RE-91-37 *Resuelto:* 12 de enero de 1994

*Juan Rafael González Muñoz* y *Alberto Omar Jiménez Santiago,* de *Bauzá y Dávila,* abogados del recurrente; *José Angel Cangiano,* abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

## I

Trazar correctamente las coordenadas decisorias del presente recurso exige la más escrupulosa exposición del trasfondo fáctico.

A comienzos de febrero de 1983, mientras el entonces Alcalde de Ponce, José G. Tormos Vega, se encontraba en el estado de la Florida, el Director Municipal de Finanzas Santiago Diou se comunicó telefónicamente con Roberto Hatton para concertar una cita. Como resultado, esa misma tarde se

reunieron en la oficina de Hatton en Salinas. Diou le informó a Hatton la necesidad de obtener equipo y materiales médico-quirúrgicos para el Centro de Diagnóstico y Tratamiento, Valentín Tricoche. Le manifestó que el Municipio de Ponce (en adelante Municipio) atravesaba por una crisis económica y no contaba con los fondos para sufragar los gastos, pero que tan pronto mejorara la situación financiera recibiría el pago. Además, Diou citó a Hatton para que compareciera a una reunión en dicho centro con su Director Médico, Dr. Julio Arango. En esta segunda reunión Diou ordenó la fabricación de un equipo de almacenamiento, despacho y control de medicinas a ser utilizados en la remodelación de la farmacia de "Tricoche" a un costo —según la prueba— de $667,103.27.[1] Hatton le indicó a Diou que los equipos *tardarían varios meses* debido a que gran parte tenía que ser diseñada y construida de acuerdo con las especificaciones que surgirían de un plano del área de la farmacia que era necesario preparar, para cuya confección era inminente contratar personal especializado de Estados Unidos que efectuaría los correspondientes estudios de estructura, metalurgia y proceso de flujo. *A pesar de esta realidad, el Municipio no efectuó subasta y trató el asunto como una supuesta compra "de emergencia".*

El plano del área de la farmacia fue entregado al Municipio el 22 de julio de 1983, casi seis (6) meses más tarde, a través del Lcdo. Roberto Conde. Tres (3) meses después, en octubre, Hatton estuvo en condición de entregar los equipos. Para esa fecha el Alcalde era José Dapena Thompson y no Tormos Vega. La nueva administración municipal se negó a recibirlos, por lo que desde entonces se encuentran almacenados y bajo el control de Hatton.

Debido a la renuencia del Municipio a recibir el equipo, Hatton gestionó una reunión con el nuevo Alcalde Dapena

---

[1] De un minucioso estudio de los autos y del expediente del caso no se desprende exactamente qué equipo fue entregado al Municipio de Ponce (en adelante Municipio) y cuál permanece en los almacenes del demandante Hatton.

Thompson. Luego de celebrada y efectuar otras gestiones, se acordó suscribir un contrato de arrendamiento para legalizar la situación y así viabilizar el recibo del equipo. Sin embargo, el contrato redactado no fue suscrito, toda vez que el Alcalde Dapena Thompson le indicó a Hatton que por ser año eleccionario no podía suscribir contratos de arrendamiento por un plazo mayor de doce (12) meses.(²)

Después de las elecciones generales de 1984, Hatton realizó múltiples e infructuosas gestiones para entregar el equipo y cobrar su dinero. El 3 de enero de 1983, Hatton, por sí y haciendo negocios como *Hospital and Surgical Systems, Inc.*, demandó al Municipio por incumplimiento de contrato en el Tribunal Superior, Sala de Ponce. El Municipio negó responsabilidad y adujo que la venta o contrato se efectuó sin subasta pública; que no había presupuesto para estos fines, y que Hatton realizó el negocio con personas no autorizadas.

Oportunamente el tribunal (Hon. Felipe Ortiz Ortiz, Juez), dictó sentencia a favor de Hatton y condenó al Municipio a pagar $667,103.27. El ilustrado foro reconoció la necesidad de que los municipios efectúen subasta pública cuando vayan a adquirir bienes o servicios en exceso de $10,000, pero entendió que existía un "estado de emergencia" al amparo del Art. 7.04 de la entonces vigente Ley Orgánica de los Municipios de Puerto Rico, 21 L.P.R.A. sec. 3204 (Sup. 1986). Aplicó, además, la doctrina de enriquecimiento injusto. A solicitud del Municipio, revisamos.(³)

---

(²) La disposición legal invocada por el Alcalde para justificar su negativa —aceptada como buena por el demandante Hatton, Art. 7.08(b) de la Ley Orgánica de los Municipios de Puerto Rico— sólo hubiera avalado el contrato "en aquellos casos o situaciones en que se vean amenazados de interrupción o se interrumpan servicios esenciales a la comunidad". En lo pertinente expone:

"(b)Durante este mismo período, el municipio no podrá comprometerse en contratos de arrendamiento o servicios excepto en aquellos casos o situaciones en que se vean amenazados de interrupción o se interrumpan servicios esenciales a la comunidad." 21 L.P.R.A. sec. 3208 (Sup. 1986). Véase, además, el *Exhibit* XII de la parte demandante.

(³) El Municipio hace los señalamientos siguientes:

## II

■ De entrada reiteramos que los preceptos legales que rigen las relaciones económicas entre entidades privadas y los municipios están revestidos de un gran interés público y aspiran promover una sana y recta administración pública. A fin de cuentas, "[l]a buena administración de un gobierno es una virtud de democracia, y parte de una buena administración implica llevar a cabo sus funciones como comprador con eficacia, honestidad y corrección para proteger los intereses y dineros del pueblo al cual dicho gobierno representa". *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, 126 D.P.R. 864, 871 (1990). Es, pues, necesario evitar el favoritismo, la corrupción, el dispendio, la prevaricación, la extravagancia, el descuido y los riesgos de incumplimiento. Por tal razón, estas normas no pueden descartarse, aun en situaciones meritorias que exigen cierta flexibilidad, tales como la adquisición de bienes y servicios en casos de emergencia y otras situaciones excepcionales. Art. 8.02 (21 L.P.R.A. sec. 3252 (Sup.1986)). En esas instancias se dispensa al Municipio del requisito de subasta pública, pero se requiere una escrupulosa adhe-

---

"A. Si en virtud de los requisitos establecidos por la Ley Orgánica de los Municipios el Municipio de Ponce está obligado a adquirir y pagar $667,103.27 al demandante recurrido por unos muebles que éste fabricó para el Municipio, sólo por instrucciones del Director de Finanzas Municipales sin que se hubiera celebrado la correspondiente subasta pública, sin que el Alcalde Interino hubiera decretado un estado de emergencia según lo requiere la ley para eximir el requisito de subasta, sin contrato y orden de compra formal y sin que hubiera fondos públicos presupuestados.

"B. Si erró el tribunal al atribuirse la facultad que la Ley Orgánica de los Municipios confiere exclusivamente a los alcaldes para decretar un estado de emergencia; y aún en el caso contrario a nuestra contención el tribunal tuviera autoridad para hacerlo, éste incurrió en error al concluir que el procedimiento de emergencia establecido por la ley podía ser utilizado para ordenar la fabricación de unos muebles para remodelar la farmacia municipal, gestión que por su naturaleza no era susceptible de acción inmediata.

"C. Si los requisitos para la compra de equipo y la obligación de fondos públicos municipales preceptuados en la Ley Orgánica de los Municipios, con el propósito de promover la sana administración pública y de evitar prevaricación, constituyen tales requisitos de orden público cuya falta de cumplimiento impide que en ausencia de contrato válido el demandante recurrido pueda invocar las doctrinas de equidad como el enriquecimiento injusto para exigir del Municipio de Ponce la aceptación de los muebles y el pago de $667,103.27." Solicitud de revisión, págs. 6–7.

sión a los procedimientos especiales diseñados para proveer flexibilidad, a la par que prevenir el despilfarro, la corrupción y el amiguismo. Los tribunales debemos estar vigilantes y evitar que se utilicen estos procedimientos para burlar las disposiciones legales dirigidas a asegurar la más sana administración pública. Examinemos, pues, las normas atinentes en la Ley Orgánica de los Municipios de Puerto Rico, Ley Núm. 146 de 18 de junio de 1980 (21 L.P.R.A. sec. 2001 *et seq.*).([4])

 Para la compra de materiales, equipo, medicinas y comestibles de naturaleza igual o similares, cuyo valor exceda de diez mil (10,000) dólares, los Municipios *deberán celebrar subasta pública.* Art. 8.01 (21 L.P.R.A. sec. 3251). *Es menester comprobar que existe la partida presupuestaria válidamente disponible.* Art. 7.03(c) (21 L.P.R.A. sec. 3203); *Ocasio v. Alcalde Mun. de Maunabo,* 121 D.P.R. 37 (1988), y *Morales v. Municipio de Toa Baja,* 119 D.P.R. 682 (1987). Además, la Ley Núm. 18 de 30 de octubre de 1975 (2 L.P.R.A. secs. 97–98) impone a los municipios la obligación, *sin excepción alguna,* de mantener un registro de *todos* los contratos que otorguen —incluyendo sus enmiendas— y remitir copias a la Oficina del Contralor dentro de los quince (15) días siguientes. El interés legislativo que late en este importante precepto va dirigido a evitar los pagos y las reclamaciones fraudulentas o ilegales, mediante la creación de un mecanismo de cotejo que preserva cronológicamente las circunstancias de estos contratos a través de los requisitos de que se reduzcan a escrito, mantenga un registro (que permite establecer la existencia prima facie del contrato), se remita copia a la Oficina del Contralor y se acredite el momento en que se otorgó. *Oca-*

---

([4]) Fue derogada por la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991, Ley Núm. 81 de 30 de agosto de 1991, según enmendada, 21 L.P.R.A. sec. 4001 *et seq.* No obstante, las normas relacionadas con esta área permanecieron inalteradas. Véanse: Arts. 3.009, 8.004, 8.005, 8.016, 11.001 y 11.002 de la nueva ley, 21 L.P.R.A. secs. 4109, 4354, 4355, 4366, 4501 y 4502, respectivamente.

*sio Ocasio v. Alcalde Mun. de Maunabo*, supra, págs. 53–54.

La aplicación de estos preceptos a los hechos del caso revela que los acuerdos entre Hatton y los entonces funcionarios del Municipio fueron ilegales. No se celebró subasta pública ni había partida presupuestaria para estos fines, según surge del testimonio no controvertido del Director de Presupuesto municipal. La propia ley pauta el efecto jurídico del incumplimiento con estas normas: *"[t]odo contrato ejecutado en contravención de lo aquí dispuesto será nulo y quedará sin efecto."* (Énfasis suplido.) 21 L.P.R.A. sec. 3451(a) (Sup.1986). Incidió el reputado tribunal sentenciador.

## III

Lo anterior no dispone del recurso. Hatton invoca un supuesto "estado de emergencia" que a su juicio justificaba apartarse de todas las normas aludidas. El tribunal de instancia acogió esa tesis. También erró. Nos explicamos.

En casos de emergencia la situación debe ser *legítima y* debe *requerir "la entrega inmediata* de materiales, equipo o ejecución de servicios". A esos efectos, *"el Alcalde o su representante autorizado* deberá dejar *constancia* de los hechos o circunstancias que justifican el que no se lleve a cabo mediante procedimiento de subasta". (Énfasis suplido.) Art. 8.02 (21 L.P.R.A. sec. 3252(c) (Sup. 1986)).

*Este mecanismo no es sustituto de una buena planificación ni remedio para la rutinaria improvisación.* No toda emergencia está a su alcance; sólo cuando ocurra "un suceso o combinación ocasional de circunstancias que exija inmediata acción". Art. 7.03 (21 L.P.R.A. sec. 3203(d) (Sup. 1986)).[5] Además, la autorización al funcionario a cargo de

---

[5] Notamos que en la ley se vislumbran dos (2) situaciones de emergencia. El Art. 3.02 autoriza al Alcalde a promulgar un "estado de emergencia ... cuando por razón de desastre mayor provocado por fenómenos naturales o de cualquier otra situación que por razón de su ocurrencia y magnitud ponga en inminente peligro la

las finanzas para incurrir en estos gastos u obligaciones será "por *escrito*, haciendo constar los hechos que motivan la emergencia"[6] y esto, *sólo* "hasta una cantidad equivalente al cinco (5) por ciento de la suma total de presupuesto de gastos de funcionamiento ...". Íd. Además, informará a la Asamblea Municipal de tal determinación. Asimismo, el monto de estas deudas "será incluido con carácter preferente en el próximo presupuesto del Municipio". Íd. Por su parte, la Asamblea Municipal habrá de ratificar y convalidar las actuaciones y los gastos resultantes del ejercicio del Alcalde en su facultad para declarar un estado de emergencia. Art. 4.18 (21 L.P.R.A. sec. 3068(15) (Sup. 1986)).

■ Es evidente que todas estas salvaguardas encarnan el propósito legislativo de evitar que los estados de emergencia —bien reales o ficticios— sean mal utilizados por funcionarios municipales y terceras personas. Estos propósitos sólo se logran observando y siguiendo el sistema diseñado que requiere la adecuada documentación de los hechos que justifican la declaración por escrito, la ratificación por la Asamblea Municipal y el límite de dinero susceptible de ser utilizado así.

---

vida, seguridad, tranquilidad y bienestar de la ciudadanía e interrumpa en forma notable los servicios esenciales de la comunidad". 21 L.P.R.A. sec. 3002 (Sup. 1986). Por otro lado, el Art. 8.02 (21 L.P.R.A. sec. 2252 (Sup. 1986)) exime del requisito de subasta pública, al adquirir materiales o servicios para el municipio, en casos de emergencia según esta queda definida en el Art. 7.03. Este artículo dispone que el "término 'emergencia' se entenderá [como] un suceso o combinación ocasional de circunstancias que exija inmediata acción". 21 L.P.R.A. sec. 3203 (Sup. 1986). La segunda definición es la que aplica en este caso.

[6] En lo pertinente, el Art. 7.03, *supra*, expone:

"(d)No obstante lo antes expresado, *el Alcalde* en casos de emergencia podrá autorizar *por escrito, haciendo constar los hechos que motivan la emergencia*, al funcionario a cargo de las finanzas a incurrir en gastos u obligaciones en exceso de los créditos asignados hasta una cantidad equivalente al cinco (5) por ciento de la suma total del presupuesto de gastos de funcionamiento. *La Asamblea será informada de tal determinación*. El monto de las deudas equivalentes al citado cinco (5) por ciento *será incluido con carácter preferente en el próximo presupuesto del municipio*. Para propósito de este inciso (d) el término "emergencia" se entenderá un suceso o combinación ocasional de circunstancias que exija inmediata acción. Disponiéndose, que lo aquí dispuesto no será de aplicación durante el término que se establece en la sec. 3208(a) de este título." (Énfasis suplido.)

Aclarado el alcance de estas disposiciones, la valoración del reclamo sobre una situación de "emergencia" hemos de hacerla con *cautela*: "[s]olamente así puede quedar plenamente satisfecho el sentir legislativo y la conciencia judicial adjudicativa sobre desembolso de fondos públicos." *Ocasio v. Alcalde Mun. de Maunabo*, supra, pág. 54. Acometamos la tarea.

## IV

*Primero,* los equipos en controversias *no* son, por su *naturaleza,* susceptibles de ser adquiridos mediante el proceso de emergencia, diseñado sólo para la adquisición y entrega *inmediata* de bienes y servicios. La prueba refleja que el propio Hatton le comunicó a Diou que le tomaría varios meses "diseñarlos y construirlos de acuerdo a las especificaciones que surgirían de un plano del área de la farmacia que era necesario preparar para cuya confección era inminente la contratación de personal especializado de los Estados Unidos que efectuaría los correspondientes estudios de estructura, metalurgia y proceso de flujo". Apéndice, pág. 8.

Si los equipos tardarían varios meses en estar listos, ¿era mucho esperar diez (10) días para efectuar la subasta? La contestación negativa es evidente.

*Segundo,* no concurrieron los requisitos legales para configurar un "estado de emergencia". Ni el Alcalde ni su representante autorizado declararon dicho estado de emergencia. No hay constancia alguna de los hechos o circunstancias que justificaban prescindir de la subasta. De hecho, la prueba desfilada establece que estos equipos no fueron ordenados por el Alcalde ni su representante autorizado; no hay constancia escrita de tal autorización al funcionario a cargo de las finanzas para incurrir en estos gastos. Tampoco se comunicó a la Asamblea Municipal, ni los gastos fueron incluidos con carácter preferente ni de

otro modo en el presupuesto siguiente. Por último, no existe prueba indicativa de que la Asamblea Municipal de Ponce hubiese convalidado las actuaciones y gastos efectuados al amparo de las facultades especiales existentes durante un estado de emergencia.

## V

█ Finalmente, réstanos examinar la aplicabilidad de la doctrina de enriquecimiento injusto.

Para ello, deben estar presentes los requisitos siguientes: " '1) [e]xistencia de un enriquecimiento[;] 2)[u]n correlativo empobrecimiento[;] 3)[l]a conexión entre empobrecimiento y enriquecimiento[;] 4)[f]alta de causa que justifique el enriquecimiento[;] y 5)[i]nexistencia de un precepto legal que excluya la aplicación del enriquecimiento sin causa.' " *Ortiz Andújar v. E.L.A.*, 122 D.P.R. 817, 823 (1988), citando a J. Santos Briz en M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Edersa, 1984, T. XXIV, págs. 27–28.

Al definir sus contornos hemos aclarado que *no se aplicará cuando resulte contrario a una clara política pública, plasmada en un estatuto o en la Constitución.*([7]) De ese modo, simplemente ha reconocido los principios rectores en materia de contratación consagrados en los Arts. 4, 1207 y 1227 (31 L.P.R.A. secs. 4, 3372 3432). Véase *Morales v. Municipio de Toa Baja*, supra, págs. 684–685.

---

([7]) En *Plan Bienestar Salud v. Alcalde de Cabo Rojo*, 114 D.P.R. 697, 703 (1983), señalamos así los límites de la doctrina:

"1a La doctrina del enriquecimiento injusto es aplicable, dentro de determinadas situaciones, a los órganos administrativos.

"2a La aplicación de la doctrina dependerá de las circunstancias específicas de cada caso. El Código Civil no agota las situaciones a las que la doctrina se extiende.

"3a *La doctrina del enriquecimiento injusto no es invocable cuando su efecto es vulnerar un principio importante de orden público encarnado en la Constitución o las leyes del país.*

"4. La doctrina es invocable, entre otras circunstancias, cuando no se han observado ciertas formalidades de ley fácilmente subsanables o susceptibles de haber sido ejecutadas con el asesoramiento debido." (Énfasis suplido.)

Este sucinto trasfondo doctrinario pone de manifiesto su inaplicabilidad al caso de autos. Como señaláramos, los acuerdos entre Hatton y los funcionarios del Municipio *se efectuaron en abierta violación de todas las normas del orden público atinentes a la contratación entre gobiernos y entidades privadas.*

Aparte de lo expuesto, los autos reflejan otras circunstancias que justifican nuestra negativa a aplicar la susodicha doctrina. Al igual que en *Morales v. Municipio de Toa Baja,* supra, pág. 697, el demandante Hatton "conocía o debía conocer los requisitos de ley. Había contratado antes con el municipio. Las normas estatutarias aplicables persiguen proteger el interés público y no a las partes contratantes. El contratista demandante no era neófito en asuntos de contratos de obras públicas con municipios. Sólo a él es imputable su empobrecimiento".

En una declaración jurada, Hatton aseveró que "durante más de diez años he tenido relaciones comerciales con el Municipio de Ponce supliéndole medicinas, material médico-quirúrgico y equipo médico". Incluso, en su Contestación a Sentencia Sumaria de 6 de octubre de 1987, argumentó que por años participó, en conjunto con empleados del municipio, *en un esquema diseñado para burlar la ley y no tener que efectuar subasta pública.* Consistía en dividir las órdenes de compra y correspondientes facturas de manera que ninguna sobrepasara los $10,000, aunque la mercancía fuera idéntica o de naturaleza similar, y en realidad fuese ordenada y entregada de una sola vez.([8])

Indudablemente, no importa la cuantía involucrada

---

([8]) Literalmente señaló:

"El Municipio de Ponce desde el año 1983, ordenaba y recibía mercancía que sobrepasaba los $10,000.00 (cuya cantidad por ley exige se celebre subasta). Una vez recibía la mercancía procedía a dividir los precios de las distintas entregas para reflejar órdenes de compra cuyos totales no sobrepasaran el requisito de la orden de compra. Si se examinan los documentos cuidadosamente, de ellos surge que *en nuestro caso en varias ocasiones hicimos entregas de mercancía cuyo valor sobrepasa los $10,000.00. Sin embargo el Municipio de Ponce procedió a dividir en varias órdenes de compra los totales para hacer una falsa representación del valor real de la mercancía recibida.*" (Énfasis suplido.)

—procedimientos normales o excepcionales— el manejo prudente de fondos públicos está saturado de intereses de orden público. Merece recordar que "es importante; lo sería, por pequeña que fuera, cualquier suma, cuando se trata de los bienes, del dinero de una comunidad municipal. Los intereses de esas comunidades son los del pueblo, los de los contribuyentes; y su empleo o inversión *requieren un gran cuidado que se traduce en las exigencias legales*". (Énfasis suplido.) *Vázquez v. Municipio*, 40 D.P.R. 509, 512 (1930).

En definitiva, nos negamos a elevar a rango de *precedente judicial* actos efectuados contra las leyes que encarnan principios fundamentales de política pública y sana administración de fondos públicos. De la manera más enérgica rechazamos esa pretensión.

Por estos fundamentos, *se dictará sentencia revocatoria y se declarará sin lugar la demanda.*

La Juez Asociada Señora Naveira de Rodón concurrió con el resultado sin opinión escrita.