EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| R & B Power, Inc. <br><br>    Demandante-Recurrida <br><br>       v. <br><br> Estado Libre Asociado de Puerto Rico; Autoridad de Acueductos y Alcantarillados; Ing. Jorge A. Rodríguez Ruiz en su capacidad de Director Ejecutivo de A.A.A.; Luis Nevárez, en su capacidad de Director de Compras de A.A.A.; y Félix Núñez en su capacidad de Coordinador de la RFP (2005-001) de la A.A.A. <br><br>    Demandados-Peticionarios | Certiorari <br><br> 2007 TSPR 51 <br><br> 170 DPR \_\_\_\_ |

Número del Caso: CC-2005-757

Fecha: 20 de marzo de 2007

Tribunal de Apelaciones:

        Región Judicial de San Juan

Juez Ponente:

        Hon. Heriberto Sepúlveda Santiago

Abogados de la Parte Peticionaria:

        Lcdo. Pedro Santiago Rivera
        Lcdo. Andrés Ramírez Marcano

Abogado de la Parte Recurrida:

        Lcdo. Tomás Correa Acevedo

Abogados de la Parte Interventora:

        Lcda. Marie L. Quiñones Tañón
        Lcdo. Manuel I. Vallecillo

Materia: Injunction Preliminar y Permanente, Orden de Entredicho Provisional

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| R & B Power, Inc.<br><br>    Demandante-Recurrida<br><br>             v.<br><br>Estado Libre Asociado de Puerto Rico; Autoridad de Acueductos y Alcantarillados; Ing. Jorge A. Rodríguez Ruiz en su capacidad de Director Ejecutivo de A.A.A.; Luis Nevárez, en su capacidad de Director de Compras de A.A.A.; y Félix Núñez en su capacidad de Coordinador de la RFP (2005-001) de la A.A.A.<br><br>    Demandados-Peticionarios | CC-2005-757 |

Opinión del Tribunal emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 20 de marzo de 2007

El caso de marras nos permite expresarnos sobre las enmiendas efectuadas a la ley orgánica de la Autoridad de Acueductos y Alcantarillados en el año 2004. En esta ocasión, la controversia gira en torno a la facultad que le fue conferida a la Junta de Directores de la Autoridad para, en aras de evitar un incumplimiento con leyes o reglamentos ambientales que pudieran redundar en multas a la agencia, decretar un estado de emergencia dispensando del proceso de subasta formal la adquisición de cierto equipo.

I

Los hechos del caso marras son sencillos y sobre los mismos no hay controversia alguna.

El 16 de abril de 2005 la Junta de Directores (la "Junta") de la Autoridad de Acueductos y Alcantarillados

(la "Autoridad" o la "AAA") emitió la Resolución Núm. 2132 eximiendo del requisito formal de subastas, la adquisición del 20% de la flota de vehículos de la Autoridad. La resolución emitida requirió que se solicitaran al menos tres cotizaciones en el mercado abierto y que se procurara obtener los mejores términos económicos posibles para la AAA. Una vez se adquiriera ese equipo la resolución perdía vigencia.

La determinación de la Junta obedeció a un informe rendido por su división de seguridad corporativa donde se concluyó que la flota de vehículos se encontraba en grave estado de deterioro por lo que la misma debía ser reemplazada en su totalidad en un plazo de cinco (5) años, pero que era necesario sustituir de inmediato el 20% de la misma. Dicho informe indicaba que debido al estado de abandono de los vehículos de la Autoridad, se podrían suscitar "interrupciones en las operaciones y el servicio de la Autoridad." Lo que se estimó redundaría en "violaciones ambientales que podrían afectar la salud . . . y pudieran dar lugar a imposiciones de multas, ya que no tenemos equipo en las condiciones óptimas para responder en casos de emergencias."

La Junta emitió dicha resolución en virtud de la Ley Núm. 92 de 31 de marzo de 2004, que había enmendado significativamente la ley orgánica de la AAA, **y autorizaba a la Junta de Directores a eximir del requisito de "subasta pública y licitación para la adjudicación de contratos de**

**construcción y compras u otros contratos cuando por situación de emergencia se estime que es necesario y conveniente a los fines de proteger la vida o la salud . . . o para evitar incumplimientos ambientales que pudieran dar lugar a la imposición de multas . . . ."** (Énfasis nuestro.) Ley Núm. 92, Art. 4.   22 L.P.R.A. sec. 151.

La Autoridad procedió a preparar un requerimiento de propuestas ("RFP" por sus siglas en inglés) donde se establecieron los requisitos, especificaciones y el procedimiento que se seguiría para la adquisición del equipo.  El documento preparado contenía un detallado itinerario de cumplimiento.  En éste se incluían, la fecha en que se emitiría el requerimiento de propuestas, la fecha para someter las mismas, la fecha de notificación del postor agraciado, la fecha de entrega de los vehículos.  El documento también identificaba cuáles eran los criterios para la adjudicación, a saber:  calidad del producto, años de garantía, plan de mantenimiento y servicio a través de toda la isla, precio, especificaciones técnicas, fecha de entrega de los vehículos.  Se indicaba que a cada criterio se le asignaría un peso y se adjudicaría a base de quién obtuviera la mejor puntuación.  El documento reconocía que la Autoridad podría negociar los términos propuestos.  El documento proveía que los licitadores podrían objetar ante el director de compras de la Autoridad los términos, condiciones o el proceso establecido en el RFP.

El documento se envió a veinte (20) compañías, entre las que se encontraba la parte aquí recurrida, R & B Power, Inc. ("R & B"). Durante el proceso, la Autoridad modificó algunos de los requerimientos o especificaciones del RFP.

Por estar en desacuerdo con los cambios introducidos por la AAA, R & B acudió --un día antes de la fecha límite para someter su propuesta a la Autoridad-- ante el Tribunal de Primera Instancia solicitando se dictara un entredicho provisional que paralizara el proceso de adquisición que se llevaba a cabo. En esencia, R & B cuestionó la validez del mecanismo de RFP utilizado por apartarse éste del procedimiento establecido en el reglamento de subastas de la AAA y cuestionó algunas de las especificaciones incluidas en el RFP. Otros dos licitadores intervinieron en el pleito impugnando también el procedimiento utilizado por la Autoridad.

El Tribunal de Primera Instancia, luego de celebrar la correspondiente vista, emitió el entredicho solicitado. Concluyó que la recurrida tenía una probabilidad de prevalecer en los méritos pues la Autoridad venía "obligada por sus propios reglamentos a utilizar el procedimiento informal de subasta para la adquisición de vehículos y equipos . . . por sobrepasar la compra los $20,000.00."

Inconforme, la AAA acudió ante el Tribunal de Apelaciones. En su escrito, adujo que el tribunal de instancia no tenía jurisdicción para atender la demanda de R & B, toda vez que el procedimiento administrativo que

conducía no había concluido por lo que no había determinación final de la cual recurrir. También señaló que la jurisdicción para revisar las decisiones administrativas finales de la Autoridad residía en el tribunal apelativo intermedio y no en el foro de primera instancia. Finalmente, la Autoridad cuestionó la validez de la orden de entredicho dictada por incumplir la misma con los requerimientos exigidos por la Regla 57 de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. II, R. 57.

El Tribunal de Apelaciones confirmó al foro primario. Enmarcando la controversia como una de agotamiento de remedios administrativos, concluyó que procedía la orden de entredicho provisional pues los recurridos no tenían un foro adecuado para impugnar la decisión de la Junta de Directores de la Autoridad de declarar un estado de emergencia que dispensó del procedimiento de subasta formal, la adquisición del 20% de su flota vehicular. El foro apelativo descartó también los errores procesales invocados.

En desacuerdo nuevamente, la Autoridad compareció ante este Tribunal. Levantó dos cuestiones ante nuestra consideración, al igual que lo había hecho ante el foro intermedio. La primera se refiere a la falta de jurisdicción del foro primario porque: (a) el proceso administrativo no había concluido; y, (b) porque una vez concluyera el mismo la jurisdicción le correspondía al Tribunal de Apelaciones. La segunda cuestión planteada se

refiere a la orden de entredicho provisional emitida y cómo la misma se aparta de las exigencias de la Regla 57 de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. II, R. 57.

El 12 de agosto de 2005 expedimos el auto solicitado. Posteriormente, y a petición de la Autoridad, dejamos sin efecto el interdicto emitido por el Tribunal de Primera Instancia. Pendiente el caso, la compañía G.T. Corp., quien habría comparecido como interventor ante el foro primario, solicitó comparecer como interventora en el proceso de marras. Luego de varios trámites procesales y de que las partes presentaran sus respectivos alegatos, el caso quedó sometido para su resolución el 12 de enero de 2006.

Pasamos a resolver.

## II

La Ley Núm. 92 de 31 de marzo de 2004 enmendó la ley orgánica de la Autoridad de Acueductos y Alcantarillados --Ley Núm. 40 de 1ero. de mayo de 1945, según enmendada-- con el propósito primordial de modificar su estructura administrativa, para formalizar el proceso de regionalización de la Autoridad. 22 L.P.R.A. secs. 141 *et seq.* Ello, luego de que el gobierno retomara la operación de la Autoridad del control de operadores privados, por estimar que el funcionamiento privado de la agencia "no ha[bía] probado ser efectiva." Exposición de motivos, Ley Núm. 92.

El legislador consideró que retomada la administración y operación de la corporación pública, resultaba imprescindible proveerle a la agencia "la flexibilidad necesaria" para operar eficientemente. Para ello, era necesario dotar a la Autoridad de "mecanismos que a largo plazo agilicen la operación del Sistema [Estadual de Acueductos y Alcantarillados] y resulten en mayor eficiencia administrativa y de servicios." *Íbid*.[1]

En este contexto, la Ley Núm. 92 enmendó la sección 11 de la Ley Núm. 40 para expandir el concepto de "estado de emergencia" que permite soslayar el proceso de subasta para la adquisición de bienes o servicios. La ley provee para que la declaración de emergencia la decrete la Junta de Directores de la Autoridad. Conforme dispone la Ley Núm. 92, decretada la emergencia, copia de dicha declaración deberá presentarse en "la Secretaría de cada una de las Cámaras de la Asamblea Legislativa dentro de los cinco (5) días laborables siguientes a su aprobación."[2]  22 L.P.R.A sec. 151.

---

[1] La Exposición de Motivos de la Ley Núm. 92 de 31 de marzo de 2004 (la "Ley Núm. 92") advierte también de la importancia que reviste para la agencia y para el país, el cumplimiento con las leyes y reglamentaciones ambientales, tanto del gobierno del Estado Libre Asociado así como el gobierno de los Estados Unidos, incluyendo específicamente, las plantas de tratamiento que operan en virtud de las dispensas otorgadas "bajo la sección 301(h) de la Ley Federal de Agua Limpia, conocidas como las Plantas 301(h)". Exposición de motivos de la Ley Núm. 92.

[2] Suponemos que esta exigencia obedece al interés de la Asamblea Legislativa de mantenerse informada de cuanto ocurra en la corporación pública.

De ordinario, las leyes o reglamentos que regulan la adquisición de bienes o servicios por los entes gubernamentales contienen una disposición que permite obviar el requisito de subasta formal en situaciones excepcionales. Como por ejemplo, cuando por motivo de emergencia se requiera de la entrega inmediata de materiales o equipo; cuando se requiera adquirir piezas de repuesto para bienes previamente subastados, o que haya un solo suplidor por lo que no es posible la competencia en precios. La sección 11 de la ley orgánica de la Autoridad tiene una disposición similar. 22 L.P.R.A. sec. 151.

Mas sin embargo, con la Ley Núm. 92 se pretendió ampliar las circunstancias en las cuales se puede soslayar el proceso formal de subasta, añadiendo a la sección 11, el siguiente párrafo:

> La Autoridad estará exenta de cumplir con el requisito de subasta pública y licitación para la adjudicación de contratos de construcción, compras u otros contratos cuando por situación de emergencia se estime que es necesario y conveniente a los fines de proteger la vida o salud de los residentes de Puerto Rico o para evitar incumplimientos ambientales que pudieran dar lugar a la imposición de multas, así como para cumplir con los fines públicos de las secs. 141 a 161 de este título, y así lo autorice la Junta en cada caso en particular mediante resolución al efecto. En dicha resolución, se expresarán las circunstancias que justifican que la Autoridad quede exenta del requisito de subasta. Copia de dicha resolución deberá presentarse en la secretaría de cada una de las Cámaras de la Asamblea Legislativa dentro de los cinco (5) días laborables siguientes a la aprobación de dicha resolución por la Junta.

Por otra parte, la ley orgánica de la Autoridad provee también que cuando no se utilice la subasta formal por

motivo de un estado de emergencia "la compra de tales materiales, efectos o equipo, o la obtención de tales servicios, **podrá hacerse en mercado abierto en la forma usual y corriente en los negocios."** 22 L.P.R.A. sec. 151.

Respecto la disposición aquí en controversia, la Exposición de motivos de la Ley 92 explica su propósito de la siguiente manera, citamos *in extenso*:

> Además, más allá de la facultad actual que tiene la AAA de determinar una emergencia para efectos de procedimientos de compras y contratación, mediante esta Ley **estamos expandiendo dicha facultad y autorizando a la Junta de Directores de la AAA a declarar todo o parte del sistema en estado de emergencia cuando las circunstancias así lo requieran. Esta facultad va dirigida, entre otras, a poder atender de manera efectiva y con carácter de urgencia aquellas circunstancias críticas y apremiantes de administración, operación o financieras que pueden repercutir en incidencias que afectan el efectivo cumplimiento con las disposiciones ambientales pertinentes,** según determine la Junta de Directores. Al facilitar la ejecución efectiva de medidas administrativas, operacionales y de mantenimiento para cumplir con leyes y reglamentos ambientales aplicables, **estas disposiciones son cónsonas con el compromiso de la AAA, y del Estado Libre Asociado de Puerto Rico, de cumplir con los Decretos por Consentimiento entre la AAA y la Agencia de Protección Ambiental Federal.** Otorgada esta facultad de declarar estados de emergencia de todo o parte del sistema, **la AAA tendrá una herramienta importante para asegurarse de cumplir con los requisitos de las dispensas a las Plantas 301(h) y demás requisitos legales y reglamentarios por lo que se le exhorta a que considere prioritariamente el estado de las Plantas 301(h)** y de declararse en estado de emergencia, ejerza todas las medidas necesarias que sus poderes **permitan para subsanar el riesgo apremiante sobre estas plantas.** (Énfasis nuestro.)

No hay duda entonces que con la aprobación de la Ley Núm. 92 el legislador pretendió, entre otras cosas,

flexibilizar los mecanismos de operación y administración de la AAA para hacer de dicha agencia una más efectiva y eficaz en el servicio que presta a la ciudadanía. La enmienda de a la sección 11, tenía como objetivo también, cerciorarse que la agencia pudiera cumplir a cabalidad con la legislación y reglamentación ambiental aplicable así como con los compromisos ambientales contraídos, principalmente, con la Agencia de Protección Ambiental del gobierno de los Estados Unidos. El legislador a su vez reconoció, que la facultad de decretar un estado de emergencia es una de carácter extraordinario encaminada a atender situaciones de "riesgo apremiante."

**III**

**A**

La Autoridad nos planteó en su recurso que el procedimiento que llevaba a cabo para la adquisición del 20% de su flota vehicular y que fue impugnado por R & B, no era propiamente un proceso de subasta por lo que no le aplicaban las disposiciones de su reglamento de subastas. Nos indicó que se trataba mas bien, de un procedimiento administrativo informal autorizado por su Junta de Directores, por lo que se regía por lo provisto en la Ley de Procedimiento Administrativo Uniforme (la "LPAU"). En atención a lo cual, no sería hasta tanto la agencia tomase una decisión final respecto a quién adjudicar la buena pro, que podría acudirse al tribunal y en todo caso, al Tribunal de Apelaciones. En vista de ello, sostuvo que el Tribunal

de Primera Instancia no tenía jurisdicción para atender la demanda de injunction presentada.

Adujo en su escrito que la determinación de la Junta de Directores decretando un estado de emergencia "no p[odía] ser revisada por los Tribunales", ya que, "se niega la intervención judicial sobre determinaciones administrativas . . . cuando lo prohíbe expresa o **implícitamente** un estatuto o **cuando se ha encomendado la determinación a la discreción de la agencia.**"

Por el contrario, la peticionaria al igual que la interventora, reclamaron que el procedimiento que utilizaba la AAA no era un procedimiento administrativo toda vez que el mismo no se ajustaba a la definición de la LPAU para este tipo de procedimiento.[3] 3 L.P.R.A. sec. 2102. No siendo por lo tanto el proceso de RFP uno administrativo informal, no aplicaba la revisión administrativa ante el Tribunal de Apelaciones como reclamaba la agencia.

R & B adujo también que la Ley Núm. 92 no proveyó de un mecanismo para la revisar judicialmente la declaración de estado de emergencia. Indicó que esta "emergencia" no era más que un subterfugio para circunvalar la exigencia de someter la adquisición de bienes al proceso formal de

---

[3] La sección 1.3(k) da Ley de Procedimiento Administrativo Uniforme ("LPAU"), 3 L.P.R.A. sec. 2102(k) define procedimiento administrativo de la siguiente manera:
    Significa la formulación de reglas y reglamentos, la adjudicación formal de toda controversia o planteamiento ante la consideración de una agencia, el otorgamiento de licencias y cualquier proceso investigativo que inicie una agencia dentro del ámbito de su autoridad legal.

subastas. En vista de ello, la peticionaria es del criterio que la agencia está actuando sin autoridad en ley. En cuyo caso, la única avenida disponible para impugnar tal actuación es a través del recurso interdictal presentado ante el Tribunal de Primera Instancia.

**B**

En infinidad de ocasiones hemos expresado la importancia que reviste para la buena marcha de la cosa pública, que los procesos de adquisición de bienes y servicios del gobierno se lleven a cabo con eficiencia, honestidad y completa probidad. *Empresas Toledo v. Junta de Subastas,* res. 31 de agosto de 2006, ___ D.P.R. ___, 2006 TSPR ___; *A.E.E. v. Maxon Engineering Services, Inc.,* res. 9 de diciembre de 2004, ___ D.P.R. ___, 2004 TSPR ___; RBR *Cosnt., S.E. v. Autoridad de Carreteras*, 149 D.P.R. 836 (1999). Es innecesario entonces recalcar lo que ya es jurisprudencia reiterada.

Con el propósito de uniformar los procedimientos administrativos del Estado Libre Asociado de Puerto Rico, se promulgó la Ley de Procedimientos Administrativos Uniforme, como cuerpo de reglas mínimas para gobernar de manera uniforme los procesos de adjudicación y reglamentación pública. *Perfect Cleaning Services v. Corp. del Centro Cardiovascular*, res. 16 de agosto de 2004, 162 D.P.R. ____, 2004 T.S.P.R. 138; *Asoc. de Dueños Casas Parguera v. Junta de Planificación*, 148 D.P.R. 307 (1999); *Pagán Ramos v. F.S.E.*, 129 D.P.R. 888 (1992). En relación

a los procedimientos administrativos para la adjudicación de bienes y servicios, la LPAU solamente uniformó el procedimiento de reconsideración de la adjudicación de la buena pro ante la agencia y la revisión judicial de la orden o resolución final de la entidad gubernamental en tal respecto. 3 L.P.R.A. secs. 2151, 2169 y 2172; *Perfect Cleaning Services v. Corp. del Centro Cardiovascular*, *ante.*

A falta de legislación especial, queda a la discreción de cada ente gubernamental, utilizando su conocimiento especializado, aprobar un reglamento que establezca el procedimiento y las guías a seguir para la adquisición competitiva de bienes y servicios en sus respectivas dependencias. 3 L.P.R.A. sec. 2169. Véase además, *L.P.C. & D., Inc. v. A.C.T.*, 149 D.P.R. 869, 875 (1999); *RBR Construction v. A.C.T.*, *ante*. El objetivo de la reglamentación establecida deberá ser promover la mayor competencia en las proposiciones recibidas de suerte que el Estado tenga a su disposición el mayor número de alternativas posible y de entre éstas, escoger la que más le beneficie desde el punto de vista de precio y calidad. También, la reglamentación procura evitar la colusión, favoritismo o fraude en la adjudicación del contrato. Véase, *Empresas Toledo, ante; Maxon Engineering, ante*; *L.P.C. & D., Inc. v. A.C.T.*, *ante.*

De ordinario, en la adquisición competitiva de bienes y servicios por el gobierno se utiliza el mecanismo de la

subasta pública formal o tradicional.[4]   W. N. Keyes, *Government Contract*, West Publishing Co., Minnesota, 1986, sec. 14.1, pág. 152 ("A primary method of contracting that employs competitive bids, . . . is 'sealed bidding'.  This has been traditional for public bodies.")  Para lo cual, cada entidad gubernamental promulga su propio reglamento; como lo es el caso del Reglamento 2732 de la Autoridad de Acueductos y Alcantarillados.  El que se aduce, aplica en este caso.

En términos generales, el procedimiento de subasta formal consta de varias etapas, a saber:  la preparación por parte del ente gubernamental de los pliegos de condiciones y especificaciones, el aviso de subasta al público, el recibo y posterior apertura pública de las propuestas selladas recibidas, la evaluación y estudio de las mismas por un comité evaluador, la recomendación del comité respecto la adjudicación de la buena pro, la adjudicación de ésta y la notificación a todos los licitadores.  Una vez sometidos los pliegos de licitación y abiertos éstos, los mismos no admiten modificaciones.  La apertura de los pliegos de licitación se efectúa públicamente ante todos los licitadores.  No hay cabida en este proceso para la negociación de los términos sometidos entre agencia y licitador.

---

[4] La caracterización de la subasta como "formal" obedece al deseo de diferenciarlo del proceso de requerimiento de propuestas el cual se cataloga o describe como uno de naturaleza informal.  Somos conscientes, no obstante, que la LPAU establece que la subasta constituye un procedimiento informal.  Véase, 3 L.P.R.A. sec. 2169.

De otra parte, el RFP o requerimiento de propuesta, es otro mecanismo disponible al gobierno para adquirir bienes y servicios. **Su característica sobresaliente es que admite negociación**. J. McBride, T. Touhay, *Government Contracts, Cyclopedic Guide to Law, Administration, Procedure*, Lexis-Nexis, 2007 (sup), vol. 1-B, sec. 9.20[3], págs. 9-10. ("Requests for proposals (RFP's) are used in negotiated procurements to communicate the government's requirements to prospective contractors and to solicit proposal.") El RFP, es ante todo, un mecanismo de compra negociada.

Frecuentemente se recurre a éste cuando se trata de la adquisición de bienes o servicios especializados, que involucran asuntos altamente técnicos y complejos o cuando existen escasos competidores cualificados. Véase, Comment, Request for Proposals in State Government Procurements, 130 *U.Pa.L.Rev.* 179, 181 (1981)("Competitive negotiation is generally employed by the government to purchase sophisticated technology that is produced by a limited number o suppliers and cannot be readily defined by precise specifications.")

En el requerimiento de propuestas se deben enumerar los requisitos y factores que se utilizarán para la adjudicación del contrato en cuestión y a los cuales todo licitador tiene que ser responsivo. Habitualmente se le adjudica un valor o peso a los factores que se van a

considerar al adjudicar la buena pro.[5]  El documento
describe cómo se llevará a cabo el proceso, incluyendo el
itinerario para recibir, evaluar y adjudicar la buena pro y
los términos del contrato que se otorgará.  Y como ya
indicamos, este mecanismo admite la negociación entre el
oferente y la entidad gubernamental mientras se evalúan las
propuestas recibidas.  De ordinario este hecho se hace
constar en el documento en sí.  Véase, McBride, Touhay, *op.
cit.*, sec. 9.20[3].

Sobre las diferencias entre la subasta formal y el
proceso de requerimiento de propuestas se ha indicado lo
siguiente:

> By definition, any contract awarded without using sealed bidding procedures is a negotiated contract. . . [**U]nlike sealed bidding negotiation is a 'procedure that includes the receipt of proposals from offerors, permits bargaining, and usually affords offerors an opportunity to revise their offers before award of contract'.** (Énfasis nuestro.)

Keyes, *op. cit.*, sec. 15.3, pág. 197.

---

[5] Los tratadistas McBride y Touhay señalan en su obra los siguiente:

> In addition to the specification, a solicitation for competitive proposals, **must include, at a minimum, a statement of all significant factors and subfactors the government reasonably expects to consider, the relative importance assigned to each of these factors and subfactors, a statement indicating whether the proposals will be evaluated and awarded with discussions with offerors or without discussions with offerors, and the time and place for submission of proposal.**

J. McBride, T. Touhay, *Government Contracts, Cyclopedic Guide to Law, Administration, Procedure*, Lexis-Nexis, 2007 (sup), vol. 1-B, sec. 9.20[3], pág. 9-11.

De lo anterior se desprende con meridiana claridad que el mecanismo de requerimiento de propuestas se destaca por su mayor informalidad y flexibilidad, así como por el grado de discreción que se le confiere a la entidad pública en la consideración de la propuesta recibida, en comparación con la subasta tradicional.[6] Sigue siendo éste sin embargo, un mecanismo alterno para la adquisición de bienes y servicios en el gobierno y como tal, necesariamente, participa de alguna de las características de la subasta formal.

Como ya discutimos, en el caso de autos la Asamblea Legislativa eximió del procedimiento de subastas formal aquellas compras de bienes o servicios que como resultado de una emergencia de carácter ambiental, fueran necesarias en un momento dado. La Legislatura no tuvo a bien especificar qué mecanismo se debía utilizar la Autoridad para estos casos, aunque su ley orgánica sí dispone que estas adquisiciones "podrá[n] hacerse en [el] mercado abierto en la forma usual y corriente en los negocios."

Así las cosas, la AAA optó por utilizar el mecanismo de requerimiento de propuestas para recibir ofertas para la

---

[6] Véase, P. Shintzer, *Government Contract Bidding*, Federal Publications, Inc., 3rd ed., 1987, pág. 3-11, donde se indicó lo siguiente:

> Unlike sealed bidding, where bids may not be modified or withdrawn between bid opening and award, changes may be made in both the solicitation and the offer in the course of [procured] negotiation. This permits a degree of flexibility not present in sealed bidding–defects and omissions may be noted and corrected, and ambiguities may be pointed out and explained.

adquisición de los vehículos.[7] Evaluado el RFP utilizado por la agencia, somos del criterio que éste cumple con los parámetros antes mencionados para este tipo de procedimiento. **Habiendo expresado claramente la Asamblea Legislativa su intención de que en estos casos de emergencia el método de adquisición de bienes y servicios no fuere la subasta formal o tradicional**, el método alterno utilizado por la Autoridad lo estimamos adecuado.

Cabe destacar que, aun cuando el RFP se configura como un procedimiento más informal que el de una subasta, no se le puede negar a quienes participan en la licitación y cuyas propuestas fueron rechazadas, el derecho a cuestionar la decisión de la agencia mediante la revisión judicial de ésta. Ello así, aun cuando el documento mismo de licitación, el RFP, nada disponga respecto el derecho de revisión judicial. Partimos de la premisa al así disponer, que existe una presunción a favor de la revisión judicial de las decisiones administrativas. Por lo tanto, en este caso, una vez concluya el proceso de selección del licitador agraciado, las partes que no prevalecieron podrán revisar judicialmente la decisión final de la agencia. Incluyendo, claro está, la declaración misma del estado de emergencia. Resulta insostenible el argumento de la Autoridad que esta determinación está exenta de revisión judicial.

---

[7] En estos casos, la mejor práctica es aprobar unas guías generales que permitan encausar la discreción administrativa.

Después de todo, este mecanismo, alterno a la subasta formal, participa de características adjudicativas de la misma forma que la subasta tradicional. En vista de ello, son de clara aplicación los principios generales establecidos en la sec. 3.16 de la LPAU., 3 L.P.R.A. sec. 2166, que exige que cuando: "la agencia concluye . . . un procedimiento adjudicativo en un caso particular, . . . notificará por escrito por correo certificado con acuse de recibo a las partes su determinación, **los fundamentos para la misma y el recurso de revisión disponible.**" Véase, *Velásquez v. Administración de Terrenos*, 153 D.P.R. 548 (2001), *RBR Cosnt., ante*, pág. 854. Véase además, *Stork v. Wickard*, 321 U.S. 288, 304 (1944).

En consideración a lo anterior, resolvemos además que la referencia a subasta pública en la sec. 3.19 de la LPAU, 3 L.P.R.A. sec. 2169, comprende, necesariamente, el mecanismo de requerimiento de propuestas utilizado en esta ocasión por la Autoridad para adquirir bienes. En cuyo caso, la parte adversamente afectada por la adjudicación de la buena pro, también tendrá derecho a solicitar la reconsideración de esa determinación.

**Advertimos que la facultad que le confirió la Ley Núm. 92 a la Junta de Directores es una facultad extraordinaria**, **pues el método preferido para la adquisición de bienes y servicios por el gobierno es la subasta formal.** Dada la naturaleza excepcional de la prerrogativa concedida, la Junta de Directores de la Autoridad deberá cerciorarse que

se cumplen a cabalidad y con rigurosidad con los criterios que hacen posible la misma. **Sólo la escrupulosa adhesión a lo que constituye una emergencia evitará el despilfarro de fondos públicos**. *E.g.*, *Hatton v. Municipio de Ponce*, 134 D.P.R. 1001, 1008 (1994).

Este mecanismo excepcional no puede convertirse en la norma y así servir de subterfugio para soslayar el mecanismo tradicional de adquisición competitiva de bienes y servicios por los entes gubernamentales. Somos conscientes de la necesidad de proveerle al gobierno y sus agencias, mecanismos de mayor flexibilidad en el manejo de la cosa pública para poder atender con prontitud y eficazmente los problemas que aquejan a la ciudadanía. Esa flexibilidad sin embargo no puede convertirse en patente de corso para el dispendio de fondos públicos. Le corresponderá a la Junta en el descargo de su responsabilidad fiduciaria asegurarse que ello sea así. Como siempre, será responsabilidad de los tribunales velar por que las agencias y las corporaciones públicas no se conviertan en autócratas en el ejercicio de la facultad extraordinaria concedida, actuando sin parámetros adecuados y exentos de supervisión alguna.

## IV

En atención a lo previamente discutido resolvemos que procede revocar la determinación del Tribunal de

Apelaciones y desestimar la demanda instada en este caso.[8] El proceso que sigue la Autoridad es una subasta negociada por lo tanto le aplican las disposiciones de la LPAU respecto la revisión de la determinación final de la agencia ante el Tribunal de Apelaciones. Habida cuenta que el proceso de adjudicación no ha concluido aún, cualquier otro pronunciamiento en esta etapa sería prematuro.

Se dictará sentencia de conformidad.

Anabelle Rodríguez Rodríguez
Juez Asociada

---

[8] Vista la conclusión a que hemos llegado, es innecesario discutir el error señalado por la parte peticionaria sobre la orden de entredicho provisional emitida y cómo la misma se aparta de las exigencias de la Regla 57 de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. II, R. 57.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| R & B Power, Inc.<br><br>    Demandante-Recurrida<br><br>          v.<br><br>Estado Libre Asociado de Puerto Rico; Autoridad de Acueductos y Alcantarillados; Ing. Jorge A. Rodríguez Ruiz en su capacidad de Director Ejecutivo de A.A.A.; Luis Nevárez, en su capacidad de Director de Compras de A.A.A.; y Félix Núñez en su capacidad de Coordinador de la RFP (2005-001) de la A.A.A.<br><br>    Demandados-Peticionarios | CC-2005-757 |

SENTENCIA

San Juan, Puerto Rico, a 20 de marzo de 2007

Por los fundamentos expresados en la Opinión que antecede, los cuales se incorporan íntegramente a la presente se dicta sentencia revocando la determinación del Tribunal de Apelaciones y se desestima la demanda instada en este caso.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri emitió una Opinión de Conformidad y Disidente.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

R & B Power, Inc.

    Demandante-Recurrido

      vs.           CC-2005-757     Certiorari

Estado Libre Asociado de
Puerto Rico y Otros

    Demandantes-Peticionarios

Opinión de Conformidad en parte y Disidente en parte emitida por el Juez Asociado señor FUSTER BERLINGERI.

San Juan, Puerto Rico, a 20 de marzo de 2007.

Estoy conforme con toda la normativa pautada por el Tribunal mediante la opinión mayoritaria en el caso de autos. En particular, coincido plenamente con los pronunciamientos de la mayoría respecto al alcance y propósitos de la Ley Núm. 92 de 31 de marzo de 2004; y en cuanto a la naturaleza y significado de los llamados "RFP" (requerimientos de propuesta) y sus diferencias en comparación con el procedimiento de subasta tradicional. Coincido también con lo indicado en la opinión de la mayoría del Tribunal respecto a la revisión judicial de las decisiones de las agencias emitidas al amparo de un procedimiento de requerimiento de propuesta, y a la aplicabilidad a éste de lo dispuesto en la Sec. 3.19 de la LPAU.

Con lo que no estoy de acuerdo es con el dictamen expresado en el último párrafo de la opinión mayoritaria de de que sería **prematuro** resolver de una vez la controversia concreta del caso de autos. En su opinión la mayoría del Tribunal le intima a los peticionarios lo fatídico de su proceder en este caso, al hacer hincapié en que la facultad que le concede la citada Ley Núm. 92 es una **"extraordinaria"**, y al advertirle claramente que el mecanismo de los "RFP" **"no puede convertirse en patente de corso para el dispendio de los fondos públicos"**. En mi criterio, sin embargo, la mayoría debió ir más lejos, para resolver de una vez que en el caso de autos **no se dan las circunstancias necesarias para decretar un estado de emergencia que permita dispensar del proceso de subasta formal para la adquisición de los vehículos en cuestión.**

En su opinión, la mayoría del Tribunal le da luz verde a la Autoridad de Acueductos y Alcantarillados (AAA) para que concluya el proceso de adjudicar la subasta negociada ("RPF") del caso de autos. Deja pendiente determinar si en este caso fue lícito utilizar dicho mecanismo de subasta negociada ("RPF"), hasta que la referida subasta haya concluido, si es que alguien con la legitimación activa necesaria la cuestiona entonces.

En mi criterio, sin embargo, puede resolverse ya que la AAA no estaba justificada en declarar aquí un estado de emergencia para obviar el proceso de subasta tradicional. No surge en este caso de modo alguno cuáles eran las

**obligaciones ambientales** concretas de la agencia que estaban en **riesgo inminente** de ser incumplidas si no se adquirían los vehículos en cuestión sin una subasta tradicional. Ciertamente, no surge el riesgo apremiante con respecto a las Plantas 301(h) que el legislador específicamente señaló como justificación para crear el mecanismo de los "RPF".

En este caso se trasluce con claridad que se ha reclamado por la agencia un **innominado** estado de emergencia como subterfugio para soslayar la subasta tradicional. Aunque la mayoría del Tribunal atisba e intima tal subterfugio, se queda corta en resolver lo que procede, que sería anularlo. Como no comparto aquí las reservas de la mayoría por terminar de adjudicar este asunto, yo disiento de esta parte del dictamen mayoritario.

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO