# 2007 DTA 110

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE FAJARDO - PANEL VIII**

GREASE PIT INDUSTRIAL PARTS & SERVICES, INC., REPRESENTADA
POR SU PRESIDENTE, FRANCO ACEVEDO
Demandante-Recurrida

v.

MUNICIPIO DE RÍO GRANDE
Demandado-Peticionario

Núm. KLCE-07-00356

San Juan, Puerto Rico, a 11 de septiembre de 2007

Panel integrado por su Presidente, el Juez Martínez Torres,
la Juez Cotto Vives y el Juez Miranda De Hostos

Martínez Torres, Juez Ponente

## TEXTO COMPLETO DE LA RESOLUCIÓN

El Municipio de Río Grande comparece ante nos y nos solicita que revoquemos una resolución titulada *"Sentencia Parcial Enmendada"*, emitida por el Tribunal de Primera Instancia, Sala de Fajardo, el 22 de enero de 2007. En la referida sentencia, el tribunal *a quo* declaró válido el contrato núm. 99-107 y su enmienda, núm. 99-107A. Además, declinó adjudicar la validez del contrato núm. 99-119 bajo el fundamento de que la parte demandada-peticionaria no presentó prueba de que el mismo hubiese sido anotado en el registro de contratos. Indicó que le concederá oportunidad a las partes en una vista evidenciaria para presentar prueba sobre el particular. El dictamen emitido no contiene la fraseología que requiere la Regla 43.5 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 43.5. Por lo tanto, no constituye una sentencia apelable, sino una resolución interlocutoria revisable mediante el mecanismo procesal del *certiorari*.

Examinado el expediente y acogido como *certiorari* el recurso presentado, denegamos la expedición del auto solicitado y remitimos el caso al tribunal sentenciador para la continuación de los procedimientos.

# Ernesto L. Chiesa

Ernesto L. Chiesa obtuvo su bachillerato en Artes (Filosofía) en la Universidad de Puerto Rico en 1964; obtuvo una Maestría en Filosofía en la misma institución en 1967. Luego cursó estudios doctorales en Lógica en la Universidad de California en Berkeley. En 1974 obtuvo el grado de Juris Doctor –Magna Cum Laude– en la Escuela de Derecho de la Universidad de Puerto Rico. Ha ocupado diversas posiciones en la Universidad de Puerto Rico desde 1964 hasta el presente, incluyendo Catedrático de la Escuela de Derecho donde dicta cursos de evidencia, derecho penal y procedimiento criminal. Ocupó el puesto de Secretario del Tribunal Supremo desde septiembre de 1976 hasta agosto de 1981. Fue colaborador del Tribunal Supremo en la preparación del Proyecto de Reglas de Evidencia que finalmente fuera aprobado en el 1979. Ha publicado serios artículos de revistas jurídicas. Ha sido principal colaborador de la publicación JTS®™ y autor del Análisis Editorial de Práctica Procesal Puertorriqueña, Evidencia y de la obra Derecho Procesal Penal de Puerto Rico y Estados Unidos. Su Obra Magna es el Tratado de Derecho Probatorio, bajo el sello editorial de Publicaciones JTS. El Profesor Chiesa es continuamente citado por el Tribunal Supremo al igual que por el Tribunal de Apelaciones y los Tribunales de Primera Instancia en Puerto Rico. Entre sus múltiples distinciones profesionales se cuentan: Miembro del American Law Institute; Director de la Conferencia Judicial de Puerto Rico (1990-93); Presidente del Comité de Reglas de Evidencia de la Conferencia Judicial de Puerto Rico (1984-88); Miembro del Comité de Procedimiento Criminal y Evidencia (1984-92); Miembro Honorario del Ilustre Colegio de Abogados Penalistas de Bogotá (1994) y Académico Numerario de la Academia Puertorriqueña de Jurisprudencia y Legislación.

Actualmente preside el Comité del Tribunal Supremo que revisa las Reglas de Procedimiento Criminal (con el objetivo de someter a la Asamblea Legislativa unas nuevas reglas) y es miembro de otro Comité del Tribunal Supremo que revisa las Reglas de Evidencia. Fue miembro del Comité del Tribunal Supremo que estuvo a cargo de la Revisión del Manual de Instrucciones al Jurado. Desde hace más de 18 años, el Profesor Chiesa trabaja como asesor del Secretario de Justicia y del Procurador General en materia de Derecho Penal, Derecho Procesal Penal y Evidencia.

# DERECHO PROCESAL PENAL: ETAPA INVESTIGATIVA

Esta obra pretende presentar una exposición del derecho procesal penal en la etapa investigativa, con énfasis en los derechos constitucionales que amparan al ciudadano en esa etapa del procedimiento. Habida cuenta de la primacía de la Carta de Derechos en esta zona, se alude continuamente a la jurisprudencia de la Corte Suprema de los Estados Unidos y a la del Tribunal Supremo de Puerto Rico, que son las fuentes de derecho primarias. Como es harto sabido, los derechos de la persona reconocidos en la Carta de Derechos de la Constitución de los Estados Unidos tienen que ser reconocidos por los gobiernos de los Estados y de Puerto Rico, aunque éstos pueden reconocer garantías adicionales. En el Capítulo I se aborda lo relativo a la aplicación de la Carta de Derechos de la Constitución de los Estados Unidos a Puerto Rico.

En el Capítulo II se expone el derecho que gobierna el interrogatorio de testigos y sospechosos, materia gobernada por las cláusulas del debido proceso de ley, privilegio contra la autoincriminación y asistencia de abogado. Se aborda, además, lo relativo a la determinación de admisibilidad y suficiencia de las declaraciones obtenidas en esa etapa. Aquí, el derecho constitucional es totalmente controlante, con poca regulación estatutaria.

En el Capítulo III se expone el derecho aplicable a los procedimientos de identificación de sospechosos fuera de corte. Se aborda la protección constitucional que brindan el debido proceso de ley y el derecho a asistencia de abogado, y se explica por qué no hay protección bajo el derecho contra la autoincriminación. Se alude también al rol del derecho a la intimidad en esta zona. Por supuesto, se aborda la regulación estatutaria en la Regla 252 de Procedimiento Criminal.

En el Capítulo IV, por mucho el más extenso, se aborda el complicado derecho que rige la protección constitucional contra registros y detenciones irrazonables, tanto bajo la Enmienda Cuarta como bajo la mayor protección que surge de las secciones 1, 8 y 10 de la Carta de Derechos de la Constitución de Puerto Rico. Por supuesto, se considera también la regulación en las Reglas de Procedimiento Criminal, particularmente la Regla 234 que gobierna lo relativo a la moción de supresión de evidencia. Es en este Capítulo que se aborda el derecho constitucional a la intimidad. Se aborda primeramente todo lo relativo a la regla de exclusión en que se traduce la protección constitucional (alcance de la regla de exclusión y la

moción de supresión) y luego se aborda el alcance de la protección constitucional. Esto, a su vez, se divide en las exigencias para una orden judicial de arresto o de registro (warrant clause) y en la exigencia constitucional de razonabilidad para arrestos o registros sin orden judicial. De ahí la necesidad de aludir al derecho que gobierna el arresto sin orden y lo relativo a los distintos registros sin previa orden judicial. También se consideran registros y detenciones particulares, como el "stop and frisk", la detención y registro de vehículos, registros administrativos y otros.

Finalmente, en el Capítulo V se aborda el derecho constitucional contra la autoincriminación. Primeramente se aborda el derecho en general: su alcance, limitaciones, la inmunidad como mecanismo para neutralizar el privilegio, etc. Luego se atiende lo relativo al derecho especial que ampara al ya acusado a no declarar y a que no se hagan inferencias del ejercicio de ese derecho. Aunque esta dimensión del derecho supone ya el inicio de la acción penal (más allá de la etapa investigativa), se incluye para presentar una visión más completa del derecho contra la autoincriminación. En el Capítulo II ya se había abordado el derecho contra la autoincriminación en la zona del interrogatorio de testigos y sospechosos (Miranda y su progenie).

Se advierte que queda fuera de ese libro lo relativo al derecho especial que gobierna la legislación federal especial "antiterrorista", es decir, el Patriot Act y las acciones legislativas y ejecutivas en esta sensitiva zona. Para eso hay que considerar la literatura especializada y esperar por más jurisprudencia de la Corte Suprema que aclare la validez de las limitaciones a los derechos constitucionales de la persona que entraña esa legislación.

Este libro va dirigido a estudiantes, abogados, fiscales y jueces. No hay pretensión alguna más allá de ayudar a éstos a encontrar, y tal vez entender mejor, el derecho positivo que aparentemente gobierna los procesos de investigación criminal tratados en este trabajo. Por supuesto, estamos ante una zona de continuo devenir; se produce mucha jurisprudencia que cambia ese pretendido derecho positivo. De ahí la necesidad de suplementar anualmente este libro para incorporar la jurisprudencia del Tribunal Supremo de Puerto Rico y de la Corte Suprema de los Estados Unidos.

Publicaciones JTS

# Lic. Luis E. Chiesa

## Derecho Penal Sustantivo

Luis Ernesto Chiesa Aponte es Profesor Adjunto de Derecho Penal en la Facultad de Derecho de Pace University en White Plains, New York. Obtuvo su Bachillerato en Administración de Empresas y revalidó como Contador Público Autorizado. Luego obtuvo su grado de Juris Doctor (Summa Cum Laude) en la Facultad de Derecho de la Universidad de Puerto Rico. Posteriormente, recibió el grado de Maestría en Derecho (LL.M) de Columbia University. Actualmente se encuentra cursando estudios conducentes al grado de Doctor en las Ciencias Jurídicas (J.S.D.) en Columbia University. Una porción de su tesis doctoral, la cual versa sobre ciertos aspectos debatidos de la teoría de la antijuricidad penal, ha sido aceptada para publicación en el Buffalo Criminal Law Review. Además, ha publicado sendos artículos en las principales revistas jurídicas de Puerto Rico sobre distintos aspectos del derecho penal.

Antes de comenzar sus labores docentes en Pace University, Luis Ernesto Chiesa fue Profesor Adjunto de Derecho Penal en la Facultad de Derecho de la Universidad de Puerto Rico y Oficial Jurídico del Juez Presidente del Tribunal Supremo de Puerto Rico, Hon. Federico Hernández Denton. Durante dicho tiempo, fue asesor del Comité para la Revisión del Manual de Instrucciones al Jurado de Puerto Rico adscrito al Secretariado de la Conferencia Judicial.

La teoría de la responsabilidad penal que sirve de base al Nuevo Código Penal es totalmente distinta a la que inspiró el Código Penal de 1974. A consecuencia de ello, bajo el Nuevo Código Penal es posible aducir una multiplicidad de planteamientos que bajo el Código Penal de 1974 no podían defenderse con seriedad. Ahora, por ejemplo, puede argumentarse que quien no contribuyó de forma significativa a la comisión del delito debe ser castigado mucho menos severamente que los verdaderos "autores" de la ofensa (Arts. 43-45 del Nuevo Código Penal). Esto era insostenible bajo la normativa sobre coautoría que se había adoptado en el viejo código (Art. 35 del Código Penal 1974).

Además, conforme al Artículo 9 del Nuevo Código Penal, el principio de favorabilidad ahora claramente aplica también hasta en los casos en que el convicto está cumpliendo su sentencia. Ello era, cuanto menos, dudoso bajo el anterior código. La figura de la tentativa también sufrió cambios.

Ahora solamente pueden hallarse incurso en tentativa quienes ejecutan el último acto necesario para consumar el delito. Según el viejo código, esto no era un elemento esencial de la tentativa.

De otra parte, a tenor con el Artículo 13 del Nuevo Código Penal, ya no rige en Puerto Rico la doctrina de "interpretación restrictiva" de los estatutos penales. Ahora, distinto a lo que ocurría bajo la normativa desarrollada por el Tribunal Supremo en cuanto a este particular, las leyes criminales pueden interpretarse tanto restrictiva como extensivamente. La única interpretación prohibida es la "analógica" en virtud de la cual se crean judicialmente nuevos delitos o penas.

Para entender cabalmente estos y el resto de los cambios sustanciales que ha sufrido nuestro ordenamiento penal como consecuencia del Nuevo Código, es necesario realizar un análisis comparado de los preceptos contenidos en dicho código. Sólo así puede comprenderse el alcance de las nuevas doctrinas que han sido incorporadas al derecho penal puertorriqueño por medio de este nuevo intento codificatorio. Precisamente ese es el propósito de esta obra.

El análisis que hacemos de la materia equipará al estudiante y al profesional con los conocimientos necesarios para poder sacarle el máximo provecho al Nuevo Código Penal.

Incluimos, además, el texto completo del Nuevo Código Penal con Anotaciones del Lic. Chiesa en relación con la Jurisprudencia Interpretativa del Tribunal Supremo y las enmiendas legislativas que ha sufrido dicho Código. También, se incluye sin costo alguno un DVD que contiene sobre 4,500 págs. de los documentos del historial legislativo del Nuevo Código Penal, que incluyen, entre otros: Los estudios de base, las ponencia de las Vistas Públicas sobre el Código, los Proyectos radicados en el Senado y la Cámara, los Informes de Comisión, el debate y votación final en el Senado y el trámite en la Cámara, el Código Penal y sus enmiendas y las Leyes Complementarias a la Reforma del Código Penal.

## El bosquejo de la obra es el siguiente:

➤ Introducción

- Breve recuento del proceso que culminó con la aprobación del Nuevo Código Penal.
- Examen de las bases conceptuales que subyacen al Nuevo Código Penal.

➤ Limitaciones Constitucionales al Ejercicio del Poder Punitivo

- Implicaciones del debido proceso de ley para la redacción e interpretación de leyes penales.
- Leyes Ex Post Facto y la Jurisprudencia Reciente Sobre este Particular
- Proporcionalidad y Castigos Crueles e Inusitados
- Separación de Poderes y el Llamado "Delito Administrativo"
- Los Límites al Poder de Criminalizar Conductas que Impone el Debido Proceso Sustantivo y el Derecho a la Intimidad

➤ Limitaciones Estatutarias al Ejercicio del Poder Punitivo

- El Principio de Legalidad y sus Cuatro Consecuencias
- La Eliminación de la Regla de Interpretación Restrictiva
- El Problema de las Fuentes del Derecho Penal y la Limitada Aplicabilidad del Principio de Legalidad en Puerto Rico
- El Más Robusto Principio de Favorabilidad del Nuevo Código Penal
  - » Los Problemas de la "Tercera Ley"
  - » Las Leyes Intermedias
  - » Las Leyes Temporales como Excepción a Este Principio (Art. 10 del Nuevo Código Penal)
- El Concurso de Leyes y Delitos
  - » Concurso Real
  - » Concurso Ideal y Medial
  - » Concurso Aparente
  - » Delito Continuado
  - » Delito Masa – ¿Aplica a Puerto Rico?

➤ El Primer Eslabón de la Teoría de la Responsabilidad Penal – El Comportamiento Humano

- Acciones Penalmente Relevantes
- Omisiones Penalmente Relevantes
- La llamada Comisión por Omisión (Art. 19 del Nuevo Código Penal)
- La Posesión como Comportamiento
- Casos Límite – Hipnósis, Sonambulismo, Eutanasia

➤ El Segundo Eslabón de la Teoría de la Responsabilidad Penal – La Antijuricidad

- Elementos Objetivos de la Ofensa
- Causalidad y la Nueva Figura de "imputación objetiva" y "riesgo permitido" (Art. 25).
- Elementos Subjetivos – Dolo Eventual v. "Temeridad" o "Recklessness".
- Los Elementos Subjetivos Distintos a la Intención y su Relación con la Eximente de Intoxicación Voluntaria
- El Error de Tipo del Art. 19 como una Forma de Excluir la Intención
- Las Defensas de Justificación en Puerto Rico – La Nueva y Más Restrictiva Defensa de Estado de Necesidad

➤ El Tercer Eslabón de la Teoría de la Responsabilidad Penal en Puerto Rico – La Punibilidad

- El Mayor Alcance de la Eximente de Coacción
- La Nueva Defensa de Temor Insuperable
- Las Defensas No-Exculpatorias y el Entrampamiento

INCLUYE CD QUE CONTIENE SOBRE 4,000 PAGS. DE LOS DOCUMENTOS

DEL HISTORIAL LEGISLATIVO DEL NUEVO CÓDIGO PENAL

Publicaciones JTS presenta dos nuevas obras de Derecho Penal:
Derecho Procesal Penal: Etapa Investigativa y Derecho Penal Sustantivo

PO BOX 9024120
SAN JUAN, P.R. 00902-4120
TEL. 721-0200

PRSRT STD
U.S. POSTAGE
PAID
SAN JUAN, P.R.
PERMIT NO. 1175

P.O. Box 9024120
San Juan, P.R. 00902-4120
Tel. 721-0200  Fax. 721-0205
www.pub-jts.com

Sres: Favor enviarme un ejemplar de su nuevo libro:          Fecha_____

___ Derecho Procesal Penal: Etapa Investigativa (Prof. Chiesa) - $100.00 + $3.50 S/H = $103.50

___ Derecho Penal Sustantivo (Lic. L. E. Chiesa) - $100.00 + $3.50 S/H = $103.50

___ Ambos libros (un ahorro de $50.00) - $150.00 + $6.00 S/H = $156.00

Envíese a Lcdo(a). _____

Dirección _____

                                                  Zip Code _____

Tel: _____ Fax _____ E mail _____

Forma de pago: ___ Adjunto cheque por $_____ pagadero a Publicaciones JTS.

Cárguese el importe de esta orden ($_____) a mi tarjeta de crédito: ___AX ___MC ___VISA

Núm. de tarjeta _____ Fecha exp. _____ Firma _____

Autorizo a Publicaciones JTS a renovar automáticamente estas suscripciones a su aniversario (12 meses calendario).
De no desear la renovación enviaré cancelación escrita a Publicaciones JTS.

Como consecuencia del paso del huracán Georges por la Isla, el 24 de septiembre de 1998, el entonces Alcalde del Municipio de Río Grande (en adelante, el Municipio), César Méndez Otero, suscribió el contrato número 99-107 con la compañía Grease Pit Industrial Parts & Services (GPIPS) representada por su Presidente, el señor Franco Acevedo, para realizar las labores de recogido, limpieza, remoción y transportación de escombros en dicho municipio. Se pactó, además, la contratación para servicios de limpieza pluvial y cunetones, cunetas, encintados y pocetos. El referido contrato se anotó en el Registro de Órdenes y Contratos del municipio mediante la orden de compra núm. 01390 del 16 de octubre de 1998. En lo pertinente, éste dispone en la cláusula cuarta lo siguiente:

*"No se pagará factura por servicios no prestados a la fecha de presentación de éstas al Municipio. El pago total a efectuarse no excederá de la suma de $11,114,600.00 y no se efectuará hasta tanto el Municipio no haya recibido por parte de FEMA la aprobación de los fondos y el desembolso de los mismos y que haya el Alcalde firmado la inspección y aprobación de dicho proyecto, previa la recomendación designada por el Alcalde."* (Énfasis nuestro.) ■

El 28 de septiembre de 1998, las partes suscribieron una enmienda al contrato 99-107, la cual se identificó con el número 99-107A. Mediante dicha enmienda, se aumentó a $13,699,750 la cantidad del contrato original. En los servicios a ser prestados, se incluyó una partida para el corte de árboles por la suma total de $2,585,150. En esa misma fecha, las partes suscribieron un segundo contrato, núm. 99-119, específicamente para realizar las labores de transportación de escombros desde el Municipio de Río Grande hasta el vertedero de Fajardo. En virtud de dicho contrato, el municipio pagaría a GPIPS por aproximadamente 80,000 yardas cúbicas de escombros triturados por máquina a $15 la yarda para un total de $1,200,000. En su quinta cláusula, el referido contrato establece, en lo pertinente, lo siguiente:

*"No se pagará factura por servicios no prestados a la fecha de presentación de éstas al Municipio. El pago total a efectuarse no excederá de la suma de $1,200,000.00 y no se efectuará hasta tanto el Municipio no [sic] haya recibido por parte de FEMA la aprobación de los fondos y el desembolso de los mismos y que haya el Alcalde firmado la inspección y aprobación de dicho proyecto, previa la recomendación designada por el Alcalde."* (Énfasis nuestro.) ■

Como consecuencia de Puerto Rico haber sido declarado como una zona de desastre por el Presidente de los Estados Unidos, el municipio presentó una solicitud ante la Agencia Federal para el Manejo de Emergencias (FEMA) para asistencia con los daños ocasionados por el huracán Georges. FEMA aprobó proyectos para el municipio para las categorías A, B, C y F, siendo la categoría A la correspondiente al recogido y el transporte de los escombros.

Finalmente, FEMA —mediante el *"project worksheet"* núm. 0441 (PW-0441) de 9 de noviembre de 1998—, determinó que la cantidad a la que era elegible el municipio en la categoría A de recogido de escombros era de $3,240,000, de la cual FEMA sería responsable de pagar el 90% ($2,916,000) y el Estado, el restante 10%. El municipio no tiene obligación de pagar cantidad alguna en esta categoría. Asimismo, en el *"project worksheet"* núm. 11910 de 3 de agosto de 1999 (PW-11910), la FEMA determinó que la cantidad final aprobada para el transporte de escombros era de $526,822, de cuya cantidad la agencia federal aportaría el 90% ($474,140) y el municipio, el restante 10%. La cantidad total aprobada por FEMA para el municipio fue de $4,958,807 para las cuatro categorías de los proyectos. De esta cantidad, $2,403,135 corresponden a los trabajos para los cuales se contrató a GPIPS, distribuidos de la siguiente manera: $1,875,620 para la recolección de escombros y $527,515 para el transporte de éstos. Los dineros restantes corresponden a otras categorías de proyectos que fueron aprobados.

El municipio hizo uso de las dos apelaciones a las que tiene derecho para impugnar las cuantías asignadas

por FEMA en las órdenes de proyectos PW-00441 y PW-11910. Ambas apelaciones fueron denegadas por dicha agencia federal. Finalmente, el municipio pagó a GPIPS por los trabajos contratados, la cantidad de $3,881,112.

Así las cosas, el 19 de julio de 2001, GPIPS presentó una demanda de cobro de dinero contra el Municipio de Río Grande, en la que adujo que este último le adeudaba la suma de $4,307,485 por concepto de recogido de escombros, trabajos en los camiones y recogido de escombros depositados en el vertedero de Fajardo para el año 1998. Añadió que la deuda está vencida, es líquida y exigible y no ha sido satisfecha a pesar de las numerosas gestiones realizadas a esos efectos.

En su contestación a la demanda, el municipio negó que le adeudara cantidad alguna a GPIPS y que los trabajos descritos en la demanda se hubieran realizado. Entre sus defensas afirmativas, planteó que: (1) los contratos a los que se refiere la demanda son ilegales y nulos porque exceden las sumas asignadas por la FEMA; (2) los contratos fueron otorgados y registrados en sobregiro, sin que el municipio tuviera fondos presupuestados para obligarse válidamente; (3) cualquier pago que hubiera recibido o debiera recibir la parte demandante, si alguno, estaba sujeto a la contingencia de que se realizaran los trabajos según descritos y especificados en el contrato, a que FEMA aprobara los fondos y desembolsara los mismos para el pago y a que el alcalde hubiera firmado la inspección y aprobación de los trabajos, previa recomendación favorable de la persona designada por éste; (4) los pagos a la demandante estaban sujetos a que FEMA hubiera aprobado y desembolsado los fondos y que éstos estuvieran disponibles tanto al momento del registro de los contratos como a la fecha de los pagos; (5) las facturas sometidas por la demandante se registraron y se pagaron sin crédito disponible; (6) el municipio no recibió la aprobación de todos los fondos solicitados a FEMA para los fines indicados en los contratos, por lo que no podía desembolsar las sumas que le fueron pagadas a la demandante, y ésta estaba obligada a devolver lo cobrado indebidamente; y (7) el municipio no responde por actuaciones contrarias a la ley de funcionarios o empleados municipales, entre otras.

Junto con la contestación a la demanda, el municipio presentó una reconvención, en la que, en esencia, reprodujo las alegaciones en torno a la ilegalidad de los contratos por haberse éstos suscrito en violación a la ley y los reglamentos que rigen la contratación con los municipios. Entre otras cosas, también alegó que al momento de la contratación no había fondos disponibles en la partida presupuestaria para obligar válidamente al municipio y que la demandante facturó y recibió pagos sin la debida autorización o asignación de fondos de FEMA. Así pues, solicitó a la demandante que devolviera la cantidad de $3,042,500 por concepto de fondos desembolsados indebidamente.

El TPI decidió que los procesos en el caso se bifurcarían. En la primera etapa, se recibiría prueba en cuanto a la validez de los contratos y, de sostenerse la validez de los mismos, se recibiría prueba en torno a la existencia o no de alguna deuda.

En la vista en su fondo, la parte demandante presentó como testigos a los señores Guillermo Díaz Ducós, Gerente de Auditoría de la Sección de Cierre de la oficina del *"Governor's Authorized Representative"* (GAR); Frank Sánchez Ruiz, Contador Público Autorizado; y Emilio Rosa Pacheco, ex-Alcalde del municipio demandado. La parte demandante, presentó el testimonio del ex–Alcalde del municipio, el señor César Méndez Otero. Además, dicha parte renunció a la presentación de los demás testigos anunciados mediante moción presentada el 23 de marzo de 2006. Durante la vista, se presentó, a su vez, prueba documental estipulada por las partes.

El 22 de enero de 2007, el TPI emitió la resolución recurrida en la que declaró válido el contrato 99-107, así como la enmienda a éste, núm. 99-107A. No obstante, dicho foro declinó adjudicar la validez del contrato núm. 99-119 bajo el fundamento de que la parte demandada-peticionaria no presentó prueba de que el mismo hubiese sido anotado en el registro de contratos. Indicó que le concederá oportunidad a las partes en una vista

evidenciaria para presentar prueba sobre el referido contrato.

Inconforme, el Municipio de Río Grande acude ante nos mediante el presente recurso en el que alega que erró el TPI al:

"1. resolver que son válidos los contratos 99-107 y la enmienda a éste (99-107A) a pesar de que la prueba estableció que al momento de contraerse la obligación no existían fondos presupuestarios para asumir dicha obligación y los mismos excedían el monto del presupuesto operacional del municipio de Río Grande.

2. resolver que el municipio de Río Grande contrajo una obligación válida con la parte demandante-apelada y responde por ella, a pesar que se trataba de una obligación suspensiva y los contratos estaban sujetos a la condición de que el pago dependía de que FEMA aprobase los fondos y dicho organismo no aprobó el monto de la cuantía objeto de los contratos.

3. declinar pasar juicio sobre la falta de validez del contrato 99-119 bajo el fundamento de que la parte apelada no había presentado prueba con respecto a que el mismo fuera anotado en el registro de contratos y determinar que se celebraría una vista evidenciaria para que se presentase prueba en cuanto a si dicho contrato fue o no fue anotado en el registro de contratos."

## II

La Ley de Municipios Autónomos, Ley Núm. 81 de 20 de agosto de 1991, 21 L.P.R.A. sec. 4001 *et seq.*, establece que los municipios gozan de autonomía en el orden jurídico, económico y administrativo. Art. 1.006 de la Ley de Municipios Autónomos, *supra*, sec. 4004. Esta autonomía comprende, entre otras cosas, la libertad para administrar sus bienes y disponer de sus ingresos, lo que incluye la capacidad para contratar servicios. Art. 2.001, *id*, sec. 4051.

Ahora bien, la facultad del municipio de obligar fondos públicos para el pago de una obligación está condicionada a que se sigan los procedimientos establecidos por ley. *Las Marías v. Mun. de San Juan*, 159 D.P.R. 868 (2003); *Ríos v. Mun. de Isabela*, 159 D.P.R. 839 (2003); *Fernández & Gutiérrez v. Mun. San Juan*, 147 D.P.R. 824, 829-830 (1999); *Hatton v. Mun. de Ponce*, 134 D.P.R. 1001, 1005 (1994); *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37, 55 (1988); *Morales v. Mun. de Toa Baja*, 119 D.P.R. 682, 691-692 (1987). En innumerables ocasiones, el Tribunal Supremo ha dicho que carecerán de validez los acuerdos pactados en contravención con dichas normas. *Ríos v. Mun. de Isabela, supra.* Las mismas deben ser observadas aun en circunstancias de emergencia. *Hatton v. Mun. de Ponce, supra*, a la pág. 1,006.

Los requisitos que deben ser satisfechos para dar lugar a una obligación válida están gobernados por el Art. 8.001, *supra*, sec. 4351, y el Reglamento de Normas Básicas aplicables a los municipios. Entre otros requisitos, se exige que toda obligación esté debidamente presupuestada. Art. 8.004, *supra*, sec. 4354. Véase, además, *Ocasio v. Alcalde de Maunabo, supra*, a la pág. 55; *Morales v. Mun. de Toa Baja, supra*, a las págs. 691-692. En cuanto a ello, el referido Art. 8.004, *supra*, sec. 4354, establece que sólo podrán desembolsarse fondos públicos para el pago de servicios, materiales y equipo o para cualquier otro concepto que esté autorizado por ley, ordenanza o resolución aprobada a esos efectos y por los reglamentos adoptados en virtud de las mismas. Añade, a su vez, que *"los créditos autorizados para las atenciones de un año fiscal específico serán aplicados exclusivamente al pago de gastos legítimamente originados e incurridos durante el respectivo año, o al pago de obligaciones legalmente contraídas y debidamente asentadas en los libros del municipio durante dicho año"*. *Ibid.*, sec. 4354(a). Más adelante, dicho articulado indica que *"[n]o podrá gastarse u obligarse en año fiscal cantidad alguna que exceda de la asignaciones y los fondos autorizados por ordenanza o resolución para dicho año. Tampoco se podrá comprometer, en forma alguna, al municipio en ningún contrato o negociación para pago futuro de cantidades que excedan a las asignaciones y los fondos."* *Ibid.*, sec. 4354(b). Dicha ley sólo exime de este requisito los contratos de arrendamiento de propiedad mueble e inmueble y de servicios. *Ibid.*

De otra parte, el Art. 8.016, *id.*, sec. 4366, enumera los requisitos para la eficacia de un contrato entre un municipio y una entidad privada cuyo objeto sea la ejecución de obras y mejoras públicas. Además, dicho artículo le impone a los municipios la responsabilidad de mantener un registro de todos los contratos que otorguen, incluyendo las enmiendas a los mismos y la obligación de enviar copia de éstos y de las escrituras de adquisición y disposición de bienes, a la Oficina del Contralor de Puerto Rico.

Así también, la referida ley impone al alcalde, a los funcionarios y empleados en que éste delegue y a cualquier representante autorizado de éste o del Municipio, la responsabilidad de velar por la legalidad, exactitud, propiedad, necesidad y corrección de los documentos, y todos los gastos que se autoricen para el pago de cualquier concepto. Art. 8.005, *id.*, sec. 4355. Se exige un sistema de contabilidad que contenga controles adecuados para verificar la corrección de todas las operaciones. Art. 8.010, *id.*, sec. 4360.

La Ley de Municipios Autónomos reconoce como obligación del municipio *"todo compromiso contraído legalmente válido que esté representado por orden de compra, contrato o documento similar, pendiente de pago, debidamente firmado y autorizado por los funcionarios competentes para gravar las asignaciones y que es o puede convertirse en deuda exigible"*. Art. 1.003(v), *id.*, sec. 4001(v).

Las normas que rigen la contratación con municipios están revestidas de un alto interés público. Al tenor de esto es que nuestro Tribunal Supremo ha reiterado en innumerables ocasiones la imperiosa necesidad de evitar el dispendio, la extravagancia, el favoritismo y la prevaricación en los contratos gubernamentales. *Fernández & Gutiérrez, Inc. v. Mun. de San Juan, supra,* a las págs. 830-831; *Hatton v. Mun. de Ponce, supra,* a la pág. 1005. Sobre el particular, en *Mar-mol Co., Inc. v. Adm. Servicios Gens.,* 126 D.P.R. 864, 871 (1990), dicho alto foro expresó que:

*"La buena administración de un gobierno es una virtud de democracia, y parte de su buena administración implica llevar a cabo sus funciones como comprador con eficiencia, honestidad y corrección para proteger los intereses y dineros del pueblo al cual dicho gobierno representa."* *Fernández & Gutiérrez, Inc. v. Mun. de San Juan, supra,* a la pág. 829.

### III

Las obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos en que intervenga cualquier género de culpa o negligencia. Aquellas obligaciones que nacen de un contrato tienen fuerza de ley entre las partes contratantes, y deben cumplirse a tenor del mismo. Arts. 1042 y 1044 del Código Civil, 31 L.P.R.A. secs. 2992 y 2994.

En Puerto Rico, se reconoce el principio de autonomía contractual entre las partes contratantes, lo cual significa que éstas pueden establecer los pactos, cláusulas y condiciones que tengan por convenientes, siempre que no sean contrarias a las leyes, la moral y el orden público. Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372. El referido principio está atado *"al axioma jurídico de que el mero consentimiento obliga, pues, perfeccionado un contrato mediando el consentimiento de las partes, éstas se obligan desde ese momento no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley."* Art. 1210 del Código Civil, 31 L.P.R.A. sec. 3375. Véase, además, *López v. González,* Opinión de 12 de noviembre de 2004, 163 D.P.R. ___ (2004), **2004 J.T.S. 179**.

En Puerto Rico, también es doctrina sentada que cuando los términos de un contrato son claros y no dejan lugar a dudas sobre la intención de los contratantes, huelgan las reglas de interpretación, adoptadas para deducir la verdadera intención de las partes frente a un texto ambiguo o confuso. En esos casos prevalece el sentido literal de las cláusulas del contrato. Art. 1233 del Código Civil, 31 L.P.R.A. sec. 3471. Véase, además, *Marcial Burgos v. Tomé,* 144 D.P.R. 522, 536 (1997); *Trinidad García v. Chade,* 153 D.P.R. 280, 289 (2001).

En algunas ocasiones, las partes contratantes someten el cumplimiento de la obligación a la realización futura de un hecho o la llegada de determinado día. Al así actuar, están modificando la normalidad en el cumplimiento, pues es norma reconocida que las partes están obligadas al cumplimiento de la obligación desde que ésta se constituye. De este modo, solemos hablar de obligaciones puras, condicionales y a plazos. *López v. González, supra.*

Las obligaciones puras se definen como aquéllas que son exigibles desde el instante mismo de quedar constituida la relación obligatoria. Las condicionales son aquéllas cuya eficacia depende de que se cumpla un hecho futuro o incierto. Las obligaciones a plazo son las que dejan establecida la prestación, sin que pueda exigirse su cumplimiento en el momento de quedar constituida la relación obligatoria. *López v. González, supra.*

Entre las obligaciones condicionales se encuentran las obligaciones sujetas a condición suspensiva, a cuyo cumplimiento se subordinan los efectos de un acto jurídico por voluntad de los contratantes. A tales efectos, el Art. 1067 del Código Civil, 31 L.P.R.A. sec. 3042, dispone que *"[e]n las obligaciones condicionales, la adquisición de los derechos, así como la resolución o pérdida de los ya adquiridos, dependerá del acontecimiento que constituya la condición"*. (Énfasis nuestro.) El elemento característico de estas obligaciones es la incertidumbre en términos de si el vínculo jurídico adquirirá eficacia o la perderá por haberse cumplido un hecho futuro e incierto. Si la condición se cumple, la obligación cobra eficacia; si no se cumple, las partes quedan liberadas. *Jarra v. Axxis Corp.*, 155 D.P.R. 764, 773 (2001). No obstante, según nuestro Código Civil, una obligación sujeta a una condición suspensiva será nula si el cumplimiento de la condición queda al arbitrio de uno de los obligados. A esos efectos, el Art. 1068 del Código Civil dispone que:

*"Cuando el cumplimiento de la condición dependa de la exclusiva voluntad del deudor, la obligación condicional será nula. Si dependiere de la suerte o de la voluntad de un tercero, la obligación surtirá todos sus efectos con arreglo a las disposiciones de este título."* 31 L.P.R.A. sec. 3043.

Por último, el Código Civil establece que *"[s]e tendrá por cumplida la condición cuando el obligado impidiese voluntariamente su cumplimiento."* Art. 1072 del Código Civil, 31 L.P.R.A. sec. 3047.

Las partes sujetas a una obligación suspensiva tienen que realizar esfuerzos de buena fe suficiente para cumplir sus prestaciones. De no hacerlo, éstas no pueden invocar la falta de ocurrencia de la condición como defensa para desligarse de su obligación. *Jarra v. Axxis Corp., supra,* a la pág. 777.

**IV**

Este recurso versa sobre un contrato de servicios suscrito entre el municipio y una empresa privada, GPIPS, del cual, alegadamente, el primero quedó debiéndole una cantidad a la segunda. La principal controversia a dirimir es si el municipio impidió voluntariamente que se cumpliera la condición suspensiva a la cual estaba sujeta la obligación. El tribunal sentenciador entendió que sí. Como fundamento de su decisión, dicho foro indicó lo siguiente:

*"El recuento de reuniones celebradas luego de suscrito el contrato entre las partes demandantes, revela que el Municipio advino a conocimientos de hechos fundamentales que afectaban la relación contractual con Grease Pit desde el 6 de noviembre de 1998, los cuales ponían en riesgo la realización de la condición suspensiva a la que estaba sujeta el contrato 99-107 y la enmienda a éste identificada como 99-107 A.*

*[...]*

*El Municipio además, no realizó gestión, ni hay evidencia en autos que demuestre que intentó comunicar lo notificado por FEMA respecto al contrato 99-107 y 99-107 A, aún [sic] cuando dicho contrato tenía una cláusula que permitía enmiendas sobre aumento o reducción en la compensación del contratista.*

*Aunque el contrato 99-107 es uno con condición suspensiva, la realización de la misma dependía directamente de que el Municipio cumpliera con los requerimientos por parte de FEMA. El Municipio no sólo no prestó atención a los requerimientos hechos por FEMA, sino que tampoco realizó gestión correctiva alguna. Además, permitió que la parte demandada continuara proveyendo los servicios pactados en el contrato sin notificarle las determinaciones iniciales y tampoco requerirle la terminación del contrato suscrito.*

*La condición suspensiva a la que estaba sujeto el contrato 99-107 de hecho se realizo [sic] cuando FEMA asignó el cincuenta por ciento de $3,400,000.00, cantidad indicada en el contrato bajo el item 1. Al asignar dicha cantidad inicial, la propia agencia federal le indica al Municipio que el restante cincuenta por ciento sería asignado una vez el Municipio sometiera la información solicitada, así como que según aparecieran desglosados los servicios en los restantes ítems, no podían ser cubiertos por FEMA.*

***Es evidente, que quien tenía el control para que la cantidad total asignada inicialmente para el Municipio fuera desembolsada, era dicha entidad, y ésta no cumplió con la obligación de suministrar los documentos solicitados, ni de modificar o enmendar el contrato de forma que cumpliera con los requisitos establecidos por la agencia federal.***

*[...]*

***Como consecuencia del incumplimiento por parte del Municipio de su obligación de notificar al contratista sobre la determinación de FEMA y dar por concluido el contrato, o por otra parte, realizar gestiones conducentes a enmendar o modificar el contrato de forma que cumpliera con los parámetros de la agencia federal, fue que el Municipio se privó a si mismo y al contratista de recibir el desembolso por los servicios recibidos.***

*[...]*

*Existe amplia evidencia en autos sobre innumerables misivas cursadas al Municipio por parte de FEMA en las que se le indicaba el estado de los PW preparados inicialmente y se les requirió continuamente la presentación de la documentación necesaria para poder desembolsar los fondos asignados inicialmente.*

*[...]*

*Al analizar las actuaciones del Municipio, es forzoso concluir que las mismas no demostraron estar fundamentadas en el principio de Buena Fe. El Municipio era quien tenía conocimiento, por ser la única parte con acceso, sobre los señalamientos de FEMA; por ende, su forma de actuar era determinante a la realización de la condición suspensiva. En otras palabras, el Municipio pudo y debió notificar al contratista para modificar el contrato suscrito entre ambos, de forma que éste cumpliera con los parámetros de FEMA. El Municipio debió como un mínimo de exigencia emanante de la Buena Fe contractual, notificar de la decisión de FEMA al contratista y no guardar silencio mientras éste continuaba proveyendo los servicios pactados...".*
(Énfasis nuestro.) Páginas 71-74 del apéndice del recurso.

En este caso, no podemos perder de vista que estamos ante dos contratos de servicios suscritos entre el Municipio y GPIPS, el núm. 99-107 y su respectiva enmienda (99-107A) —para realizar labores de recogido, limpieza, remoción y transportación de escombros en dicho municipio— y el núm. 99-119 para realizar labores de transportación de escombros desde el municipio hacia el vertedero de Fajardo. Surge del expediente ante nos, que ambos contratos incluian una cláusula que contenía una obligación suspensiva, la cual condicionaba el pago de los servicios pactados a la contingencia de que FEMA aprobara los fondos y el desembolso de los mismos y a que el Alcalde firmara la inspección y aprobación de dicho proyecto, previa la recomendación

favorable de la persona designada por éste. A su vez, el desembolso de fondos por parte de FEMA estaba sujeto a que el municipio proveyera a la referida agencia los documentos necesarios para poder asignar y desembolsar las cantidades que dicha agencia aprobara.

De las determinaciones de hechos del tribunal a *quo* —con las cuales no intervendremos por no haberse alegado ni existir indicios de pasión, prejuicio o parcialidad de parte de dicho foro—, ■ surge que los representantes del municipio se comprometieron a conseguir la información solicitada por FEMA y a fijar una fecha para la entrega de la misma. ■ Surge, a su vez, de dichas determinaciones de hechos que, no empece al compromiso realizado, el municipio: 1) nunca le comunicó a GPIPS los señalamientos hechos por FEMA; ■ 2) no realizó gestión alguna para lograr que dicha agencia aprobara los fondos por los servicios prestados; ■ y 3) no hizo gestión alguna para enmendar o modificar el contrato existente, de manera que cumpliera con los parámetros establecidos por FEMA. ■ De acuerdo con la evidencia obrante en autos, el TPI determinó que, a pesar que desde el 6 de noviembre de 1998 el municipio ya tenía pleno conocimiento de que la condición suspensiva para que la obligación contractual fuera eficaz no se realizaría, a menos que se cumpliera con los requerimientos de documentación o enmiendas necesarias para que FEMA pudiera cubrir los servicios prestados por GPIPS, *"se cruzó de brazos sin realizar gestión alguna que permitiera el pago por los servicios ya recibidos"*. ■

Finalmente, basado en las actuaciones del municipio, el tribunal *a quo* concluyó que éste no obró de buena fe en su relación contractual con GPIPS al no notificarle la decisión de FEMA y guardar silencio mientras éste continuaba proveyendo los servicios pactados. Así pues, ante el incumplimiento de la condición suspensiva por razones atribuibles a la dejadez, falta de buena fe y de desplegar un esfuerzo razonable para cumplir con los requerimientos de FEMA, el TPI determinó que el contrato 99-107 y su enmienda, 99-107 A, eran válidos, por lo cual el municipio debía cumplir con el pago de los mismos. Al concluir de la forma que lo hizo, actuó correctamente el tribunal sentenciador.

## V

Sólo procede dictar sentencia sumaria cuando el tribunal tiene ante sí la verdad sobre todos los hechos pertinentes y no hay verdadera controversia fáctica entre las partes. *Hernández v. Bermúdez & Longo, S.E.*, 149 D.P.R. 543, 550 (1999). Cuando no existe una clara certeza sobre todos los hechos en controversia, no procede una sentencia sumaria. *Mgmt. Adm. Servs., Corp. v. E.L.A.*, 152 D.P.R. 599, 610 (2000). Es por ello que el Tribunal Supremo ha expresado que la sentencia sumaria sólo debe dictarse en casos claros y cualquier duda en cuanto a si hay hechos pertinentes en controversia debe resolverse contra la parte que solicita la sentencia sumaria. Toda inferencia que se haga a base de los hechos y documentos que obren en los autos, debe tomarse desde el punto de vista más favorable al que se opone a la solicitud de sentencia sumaria. *Id.*; *García v. Darex P.R., Inc.*, 148 D.P.R. 364, 382 (1999).

En lo que concierne al segundo contrato, núm. 99-119, el tribunal *a quo* determinó que, en vista de que del expediente del caso no surge evidencia que demuestre que éste fue anotado en el Registro de Órdenes y Compras del municipio, no era prudente resolver dicho asunto de manera sumaria. Conforme a ello, decidió darle oportunidad a las partes a presentar prueba sobre el particular en una vista evidenciaria. Sólo de esa forma, dicho foro podrá estar en posición de determinar si en este contrato se cumplieron con todos los requisitos necesarios para dar lugar a una obligación válida, según establecidos por la Ley de Municipios Autónomos, *supra*, y el Reglamento de Normas Básicas aplicables a los municipios, *supra*. Ciertamente, el mecanismo de sentencia sumaria no es el medio adecuado a ser utilizado en estos momentos para resolver la controversia relacionada en cuanto al contrato 99-119.

## VI

En resumen, dado a que la disposición del caso por el TPI, según expone el peticionario, no es contraria a derecho, ni surge de los hechos alegados fundamentos en derecho que requieran nuestra intervención, se

deniega la expedición del auto de *certiorari*.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

María E. Pérez Ortiz
Secretaria Tribunal de Apelaciones